# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 04-1721

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

DOUGLAS LONG,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Central District of Illinois.
No. 03 CR 40065—**Michael M. Mihm**, *Judge.*

ARGUED FEBRUARY 22, 2005—DECIDED OCTOBER 7, 2005

Before KANNE, WOOD, and SYKES, *Circuit Judges.*

WOOD, *Circuit Judge.* Caught with tens of thousands of images of child pornography on a personal laptop computer that he kept at work, Douglas Long pleaded guilty to one count of possession of child pornography and one count of criminal forfeiture. See 18 U.S.C. §§ 2252A(a)(5)(B), 2253. The district court sentenced Long to 96 months' imprisonment and criminal forfeiture of specified property. In this appeal, Long challenges the district court's denial of his motion to suppress evidence (an issue he reserved in his plea agreement) and his sentence. In determining Long's sentence, the district court decided to depart upward by four offense levels beyond the applicable guideline range. Even though the court used its discretion

in selecting the degree of its departure, Long's guideline range and the extent of that departure were necessarily influenced by the judge's understanding that the guidelines were mandatory. The Supreme Court, however, changed all that in *United States v. Booker*, 125 S.Ct. 738 (2005). Long failed to raise a Sixth Amendment or *Apprendi* argument to his sentence below and therefore his appeal is subject to plain error review. *United States v. Paladino*, 401 F.3d 471 (7th Cir. 2005). Because we cannot determine whether the district court would have imposed the same sentence under an advisory guideline scheme, we order a limited remand in accordance with the procedures outlined in *Paladino*. In all other respects, we affirm the judgment of the district court.

# I

On the night of July 10, 2003, Long received a call from John Brockmeier, the district manager of Washington Inventory Service, where Long worked in Moline, Illinois. Brockmeier asked Long to meet him at Long's office. Long arrived shortly thereafter; he found not only Brockmeier, but also Detectives David Frank and Kerrie Davis of the Peoria Police Department and FBI Agent Greg Catey, waiting for him. The Peoria Police had arranged the meeting with Brockmeier because the previous day a girl-friend of one of Long's employees had given the police two CDs containing child pornography and told the police that the CDs belonged to her boyfriend's boss, whom she identi-fied as Douglas Long. After conducting an examination of the CDs and verifying that they contained child pornogra-phy, the police contacted Brockmeier and arranged for the unusual evening meeting.

Once Long arrived at his office, Detectives Frank and Davis opened the conversation (which Long characterizes as an interview) by telling him that somebody had brought something illegal to the Peoria Police Department. They

asked Long whether he knew of any employees such as those who had recently been fired who might have wanted to get Long in trouble. During the conversation, the detectives indicated that the illegal items brought to the police were "two CDs with something illegal" on them. At no point, however, did they say that the CDs contained child pornography.

What happened next in the exchange between Long and the detectives is a matter of dispute. Detective Frank claims that *before* Long gave him permission to search his office and any computers, including his personal laptop, the detective asked him if there was anything illegal in the office and Long replied "to some people it might be." Detective Frank then asked what Long meant, and Long allegedly replied that there were pictures and movies of sex acts with children. Long took the position that the alleged conversation containing the admissions about possessing illegal materials and having files depicting sex acts with children did not take place prior to his giving consent to search (and perhaps never took place). What is undisputed is that Long signed a written consent form that authorized the police to search his office. The consent form allowed the officers to remove "whatever documents, items of property whatsoever, including but not limited to computer hard-ware, software, and all other external media storage, which they deem pertinent to their investigation and search said items . . . ." After signing the form, Detective Davis searched Long's office and found 10 CDs. At the same time, Detective Frank retrieved his forensic laptop, which was equipped with Encase diagnostic software. (The "Encase Cybercrime Arsenal" package is sold by a company called Guidance Software to the law enforcement community; it is described as a powerful search and diagnostic program. See http://www. guidancesoftware.com.) Using the Encase software, the detectives searched the CDs and found movies and photos of child pornography on them. When Long's

laptop was searched at a later date, the detectives found tens of thousands of images and over a hundred movies of child pornography on it as well.

After examining the content of the CDs, the detectives gave Long his *Miranda* warnings. They then continued their interview with Long. Long admitted that the CDs that the anonymous woman had brought to the police were his and that he had downloaded images of child pornography from the Internet. He explained that he had been collecting child pornography for five to six years. Long also admitted to having inappropriate sexual contact with his daughter.

Once the interview concluded, Long and the agents went to Long's home. The agents did not seize or search his home computer, because they believed Long when he said that he had used only his laptop to download images. While at his residence, Long, in the presence of the agents, admitted to his wife that he possessed child pornography and that he had had inappropriate sexual contact with their daughter. Afterwards, Long was taken to the Peoria Police station.

Long filed a motion to suppress the physical evidence seized from his workplace and his statements, on the ground that the search of his laptop and the CDs exceeded the scope of his consent. The district court denied his motion. The court found that Long "was informed that [the agents] were there in part to investigate because of allegations of wrongdoing against him and also that the allegations included allegations that there was illegal material there." The court found Long's claim that he did not know that the police would search the CDs or use forensic programs to conduct their search of the items to be beside the point, because Long had been informed of the basis of the search, the consent form he signed was very broad, and the form specifically mentioned searching "computer hardware, software, and all other external media storage."

After losing his motion to suppress, Long entered a conditional guilty plea to both counts of the indictment,

reserving his right to appeal the denial of his motion to suppress.

On March 18, 2004, the court sentenced Long to 96 months' imprisonment and 10 years of supervised release. His sentence was calculated using the 2003 version of the Sentencing Guidelines. The base level offense for violating 18 U.S.C. § 2252A(a)(5)(B) is 15. The district court increased that level by applying the following enhancements: a two-point increase for possession of material involving prepubescent minors under § 2G2.4(b)(1); a two-point increase for possession of material that resulted from the use of a computer under § 2G2.4(b)(3); a four-point increase for an offense that involved material portraying sadistic or masochistic conduct under § 2G2.4(b)(4); and a five-point increase for an offense that involved more than 600 images under § 2G2.4(b)(5)(D), which led to a level 28. At Long's sentencing hearing, the court heard arguments by defense counsel that the addition of § 2G2.4(b)(5), enacted under the Prosecutorial Remedies and Other Tools to End the Exploitation of Children Today Act of 2003 (PROTECT Act), Pub. L. 108-21, 117 Stat. 650, created a redundancy with section (b)(2) of the same guideline. At the time of sentencing, a defendant such as Long could receive both a two-point upward adjustment for having more than ten images under (b)(2) and additional upward adjustments for the number of images he possessed under (b)(5). The potential double counting was later resolved, as of November 1, 2004, through an amendment to the guidelines which consolidated § 2G2.4 with § 2G2.2 and removed the enhancement for 10 or more images. The court correctly anticipated this change by applying the guideline and then departing downward two levels to negate its effect.

The total offense level that resulted for Long's sentence was 25, after the court deducted three levels for acceptance of responsibility. With a criminal history category I, he faced a guidelines range of 57 to 71 months. The judge

decided to depart upward by four offense levels, which resulted in a final range of 87 to 108 months.

The judge structured the upward departure by referring to § 2G2.4(b)(5), which sets forth the following rules for enhancements:

> (A) at least 10 images, but fewer than 150, increase by 2 levels; (B) at least 150 images, but fewer than 300, increase by 3 levels; (C) at least 300 images, but fewer than 600, increase by 4 levels; and (D) 600 or more images, increase by 5 levels.

§ 2G2.4(b)(5). The judge explained that a four-level upward departure was appropriate for Long's sentence because "if we take the officer's estimate at 15 to 20,000 [pornographic images] and we reduce it by, let's be generous, 2,000 possible duplicates, which would be double what his suggestion was, we're still talking about 13 to 18,000 different child pornography images. That's many, many times more than the 600 that call for an upward adjustment of 5 levels." In fact, the choice of four more levels was consistent with the pattern that the guidelines establish. The structure of § 2G2.4(b)(5)(D) contemplates an increase of one offense level every time the quantity of images doubles after the first increase to 150 images, and thus the judge could have extrapolated from that pattern and increased the offense level each time the previous ceiling of the quantity of images doubled. Doing so would have resulted in a finding that a 9-level increase over the base was appropriate for at least 9,600 images but less than 19,200 (or four levels beyond the maximum of five prescribed by § 2G2.4(b)(5)(D)), which is exactly what Long got.

On appeal, Long makes three arguments: first, that the district court erred in denying his motion to suppress; second, that the court erred in upwardly departing four offense levels; and finally, that his sentence is unconstitutional in light of *United States v. Booker*, 125 S.Ct. 738 (2005), and he is entitled to full resentencing.

## II

### A

We review legal questions in connection with a district court's denial of a motion to suppress *de novo*, while we apply the normal deferential "clear error" review for underlying factual determinations. *United States v. Cellitti*, 387 F.3d 618, 621 (7th Cir. 2004). Long has essentially challenged the district court's finding that the search of his office and computer fell within the scope of his consent, noting that a consent search must stay within the boundaries of the consent that was given. *Florida v. Jimeno*, 500 U.S. 248, 251 (1991). The scope of consent is "limited by the breadth of actual consent, and whether the search remained within the boundaries of the consent is a question of fact to be determined from the totality of all the circumstances." *United States v. Raney*, 342 F.3d 551, 556 (7th Cir. 2003) (quoting *United States v. Torres*, 32 F.3d 225, 230-31 (7th Cir. 1994)). In determining the scope of a defendant's consent, we apply an objective standard: "what would the typical reasonable person have understood by the exchange between the officer and the suspect?" *Id.* (quotation marks omitted).

Long argues that no reasonable person would have expected that the detectives' request to search his "office" was meant to include a search of his personal laptop and CDs with the aid of the Encase diagnostic software installed on Detective Frank's forensic laptop. Long argues that he did not have notice that he was consenting to such an intrusive search because the police had informed him only that they were investigating something illegal that was given to them by someone who might want to get Long in trouble.

We reject Long's argument for the simple reason that the consent form he signed explicitly allowed the agents to search his office and laptop, with no limitations or

qualifications. The consent form stated, in relevant part, that the officers were authorized to remove and search any documents and property "including but not limited to computer hardware, software, and all other external media storage." Long's laptop and CDs fit within this definition, and we observe that it is impossible to search computer hardware or software without using some type of software. The fact that the Encase search engine was sophisticated is of no importance. We agree with the district court's conclusion that Long "could not reasonably assert at this point that he didn't understand that [the police] were going to search any CDs that they found." Moreover, the court credited the testimony of the officers to the effect that Long was told that "not only were there allegations of wrongdoing, but allegations that there were illegal materials in his possession." This conclusion makes it unnecessary to decide whether Long admitted prior to the search to possessing material that contained depictions of adults having sex with children—a point on which the district court gave Long the benefit of the doubt in any event. The district court correctly denied Long's motion to suppress.

**B**

We turn now to Long's challenges to the district court's decision to make a four-level upward departure in computing Long's sentence. After Congress passed the PROTECT Act and before *Booker,* the courts of appeals were instructed to review *de novo* the question whether a departure was based on a factor that did not advance the objectives of 18 U.S.C. § 3553(a)(2), or that was not authorized by § 3553(b), or that was not justified by the facts of the case. See 18 U.S.C. § 3742(e). Section 3742(e), however, is one of the two provisions that the Supreme Court "sever[ed] and excise[d]" from the guidelines in *Booker*, in the course of deciding on the proper remedy for the Sixth Amendment violation it had found. See *Booker,* 125 S.Ct. at 764-68. After *Booker*, all sentences, including those that are above or below the range that the guidelines would advise (*i.e.*, those that we would have described as the result of "departures" in the pre-*Booker* world), are to be reviewed for reasonableness. *Id.* In fact, however, whether we were conducting the *de novo* review called for by the PROTECT Act or a more generalized reasonableness review, the result would be the same for Long. Putting to one side for the moment the question whether the judge's range of choice was unduly restricted by the need he perceived to tie his decisions to the guidelines' framework, we conclude that the district court did not err (or act unreasonably) in its decision to impose a sentence above the guideline range that it had calculated, nor in the degree of its departure.

The district court concluded that an offense level of 25 "is not an accurate reflection of what [Long's] sentence should be." In deciding how many levels to add, the court relied on its authority under § 5K2.0(a)(3) to use a circumstance that "is taken into consideration in determining the guideline range, if the court determines that such circumstance is present in the offense to a degree substantially in excess of . . . that which ordinarily is involved in that kind of

offense." In Long's case, the court found that Long possessed between 13 to 18,000 images and "[t]hat's many, many times more than the 600 that call for an upward adjustment of 5 levels" under § 2G2.4(b)(5)(D). This is (or would have been) a legitimate reason for an upward departure.

The district court thus adequately explained how the departure was linked to the structure of the guidelines. See *United States v. Hogan*, 54 F.3d 336, 342 (7th Cir. 1995) ("[A] district court must link the extent of departure to the structure of the guidelines." (internal quotation marks and citation omitted)). As we noted earlier, the upward departure followed, as a practical matter, the pattern of imposing an additional offense level each time the number of images doubled from the previous cap. This was one acceptable way to link the departure to the guidelines. The court adequately explained its reasons for increasing Long's sentence, and we find no error in either the decision to depart or the degree of departure.

**C**

Finally, we consider Long's challenge that his sentence is unconstitutional in light of the Supreme Court's decision in *Booker*. In *Paladino*, we found that our plain error review in the sentencing context normally will require input from the district court before we can determine whether a defendant's substantial rights have been affected by the *Booker* error. See 401 F.3d at 483-84. The only difficult question here is whether the district court's decision to depart upward should direct us instead to the rule announced in *United States v. Lee*, 399 F.3d 864 (7th Cir. 2005). In *Lee*, we recognized that although it is usually impossible to say whether a district court's sentence would have been influenced by the knowledge that the guidelines are advisory, there are some cases in which "we can be

confident that none of [the defendant's] substantial rights was adversely affected by the district judge's application of pre-*Booker* law." *Id.* at 867. In *Lee* itself, this was plain, because the judge had sentenced Lee at the statutory maximum and had expressed regret that he could not go higher. *Lee* referred to upward departures as another possible instance, *id.* at 866-67. *Lee* did not, however, establish a *per se* rule that plain error is impossible if the district court departed upwards. As we wrote on the same day in *Paladino*, "[a] conscientious judge— one who took the guidelines seriously whatever his private views—would pick a sentence relative to the guideline range." 401 F.3d at 482.

Although we consider it a close call, we have concluded that a *Paladino* remand is necessary in this case. As a responsible district court judge in the pre-*Booker* era, the judge here adhered scrupulously to both the guidelines and the structure of the guidelines in determining the departure. Freed from the mandatory nature of that structure, the court will be free to consider the factors outlined in 18 U.S.C. § 3553(a), including those that were specifically prohibited by the guidelines and those that are not constitutionally prohibited such as race or sex. See, *e.g.*, § 5H1.11 (discouraging courts to factor "[m]ilitary, civic, charitable, or public service; employment-related contributions; and similar prior good works" in deciding whether to depart); § 5H1.12 (stating that "[l]ack of guidance as a youth and similar circumstances indicating a disadvantaged upbringing" are not relevant grounds in determining whether a departure is warranted).

At Long's sentencing hearing, the lawyers for both the government and Long emphasized numbers: the number of images Long possessed; the method the government used to calculate the number of images; the number of images that contained actual pornographic images; the number of possible duplicate images; and the quantity of images that contained aggravating circumstances to warrant the

application of other guidelines. Under advisory guidelines, defense counsel now has the opportunity to present and argue a wider range of factors that should be factored into the calculation and the weight to be accorded each factor. For example, the judge might take into account his long history of community service. Because we cannot be certain that Long's sentence would be the same under advisory guidelines, we will follow the *Paladino* procedure here.

### III

We AFFIRM the district court's denial of Long's motion to suppress and the judge's calculations under the Sentencing Guidelines. We order a limited REMAND with respect to his sentence while retaining jurisdiction in accordance with the procedure outlined in *Paladino*.

A true Copy:

      Teste:

_____
*Clerk of the United States Court of Appeals for the Seventh Circuit*
