In the

# United States Court of Appeals
## For the Seventh Circuit
_____

No. 07-1756

MICHAEL C., CHERITA C., KIMBERLY W., ET AL.,

*Plaintiffs-Appellees,*

*v.*

DANA GRESBACH,

*Defendant-Appellant.*

_____

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 05 C 650—**Lynn Adelman**, *Judge.*

_____

ARGUED DECEMBER 3, 2007—DECIDED MAY 19, 2008

_____

Before BAUER, EVANS and SYKES, *Circuit Judges.*

BAUER, *Circuit Judge.* The parents and stepparents of minor children Ian and Alexis ("Plaintiffs") sued Dana Gresbach, a caseworker with the Bureau of Milwaukee Child Welfare ("Bureau"), under 42 U.S.C. § 1983, alleging in part that Gresbach violated the children's Fourth Amendment rights when she conducted under-the-clothes examinations of each child's body during separate interviews at their private school, as part of a child abuse investigation in February of 2004. Gresbach moved for summary judgment on qualified immunity grounds. The

district court denied the motion, holding that Gresbach's conduct violated the children's rights to be free from unreasonable searches, and those rights were clearly established at the time of the searches. Gresbach appeals, arguing that she is entitled to qualified immunity because her actions were objectively reasonable under the Fourth Amendment after she received general consent from the school's principal to investigate an allegation of child abuse pursuant to Wis. Stat. § 48.981(3)(c)1, and no case clearly established that her investigation violated the children's Fourth Amendment rights. We affirm.

**I.**

In *Doe v. Heck*, 327 F.3d 492 (7th Cir. 2003), we addressed the application of the Fourth Amendment in the context of child abuse investigations by the same state agency at issue here, the Bureau, on the premises of a private school. Because we find *Heck* to be a blueprint for our analysis, a brief review of its facts and holding, as they pertain to this case, is necessary.

The Bureau, a division of the Wisconsin Department of Health and Family Services which provides child abuse prevention and related services in Milwaukee County, conducts investigations of child abuse allegations under established protocols in order to substantiate whether or not child abuse has occurred. Prior to April, 2003, Wis. Stat. § 48.981(3)(c)1[1] had been interpreted as providing Bureau

---

[1] Section 48.981(3)(c)1 provides, in pertinent part, that "[t]he agency may contact, observe or interview the child at any location without permission from the child's parent, guardian,
(continued...)

caseworkers with the authority to interview children at school without having to obtain permission from their parents or school officials. *See Heck*, 327 F.3d at 502 n. 6. In *Heck*, Bureau caseworkers received a report that a child had been spanked at his private school, which followed a corporal punishment policy. Pursuant to their investigation, the caseworkers went to the school, identified themselves to the principal, and requested to see the child for an interview. The principal initially refused to allow the workers to interview the child, however once the workers received confirmation from a Wisconsin district attorney that § 48.981(3)(c)1 gave them the authority to interview children on school premises without obtaining consent from either the parents or school officials, the principal reluctantly agreed to allow the caseworkers to interview the child, which they did, without conducting a physical examination of the child. Later, the school and the child's parents sued the caseworkers, alleging in part that they conducted an unreasonable search of the school premises and an illegal seizure of the child in violation of the Fourth Amendment. The district court found that the caseworkers were protected by qualified immunity, and we affirmed.

Under established Fourth Amendment principles, we found that a private school and its students had a reasonable expectation of privacy in and within the school's

---

[1] (...continued)

or legal custodian if necessary to determine if the child is in need of protection or services, except that the person making the investigation may enter a child's dwelling only with permission from the child's parent, guardian, or legal custodian or after obtaining a court order."

premises, and that therefore the caseworkers' warrantless search of the premises and seizure of the child in order to conduct an interview for a child abuse investigation, without the consent of the child's parents or school officials, was presumptively unreasonable. *Heck*, 327 F.3d at 510-13. We determined, in part, that "to the extent § 48.981(3)(c)1 authorizes government officials to interview children suspected of being abused on private property without a warrant or probable cause, consent, or exigent circumstances, it is clearly unconstitutional as applied." *Id.* at 515-16. We nevertheless found that a reasonable child welfare caseworker would not have understood his actions under the statute to be unconstitutional under the Fourth Amendment at the time of the alleged violation, because his conduct did not violate any clearly established law. Accordingly, we held that the caseworkers were entitled to qualified immunity, but stated that "[a]t this juncture [April, 2003] . . . we now make it clear that it is patently unconstitutional for governmental officials to search the premises of a private or parochial school and/or seize a child attending that school without a warrant or court order, probable cause, consent, or exigent circumstances." *Heck*, 327 F.3d at 517.

It is through the lens of *Heck* that we examine the district court's conclusion that Gresbach is not entitled to qualified immunity.

## II.

On February 4, 2004, a female family member of eight-year-old Ian made a child abuse report to the Bureau, stating that Ian told her that Michael C., Ian's stepfather, hit him on the wrists with a plastic stick on January 28,

2004. On February 5th, Dana Gresbach, an agent with the Bureau since 1998, was assigned the case. During the next four days, Gresbach reviewed the child abuse report, met with a manager at the Bureau, Rita Zappen, and spoke to the family member who reported the abuse. On February 9th, Gresbach went to Ian's private school, Good Hope Christian Academy ("Good Hope"), to interview Ian and his stepsister, nine-year-old Alexis.

When Gresbach arrived at Good Hope, she met with Principal Cheryl Reetz. Gresbach handed Reetz her business card and told Reetz that she needed to see Ian and Alexis. Reetz was unfamiliar with her own role in a child abuse investigation—the only real training she had received was annual review of the faculty handbook, which delineates a teacher's responsibilities as a mandatory reporter of child abuse. Reetz asked Gresbach if she could call the children's parents, to which Gresbach said no, and that Gresbach would contact the parents herself after she had spoken with Ian and Alexis. Reetz also asked Gresbach if she could observe the interviews, and Gresbach responded that Reetz need not do so. According to Reetz, she was concerned about allowing Gresbach to interview the children without parental consent, but she assumed that because Gresbach was a Bureau caseworker, Reetz was legally obligated to allow Gresbach to see the children, and that she was legally prohibited from contacting the children's parents. Gresbach did not ask permission from Reetz to physically examine Ian and Alexis for signs of abuse; she believed she was not obliged to do so, because § 48.981(3)(c)1 gave her the authority to conduct an interview and possible physical examination of the children without consent. Under *Heck*, Gresbach's belief was inaccurate.

Reetz allowed Gresbach to use her office to conduct the interviews, and she retrieved the children from their classrooms. Gresbach spent ten to fifteen minutes alone in the office with each child. Ian told Gresbach that Michael C. sometimes hit him with a flexible stick. Gresbach examined Ian's wrist for injuries, but did not see any. Gresbach asked the child to pull up his shirt, and Ian complied. Gresbach inspected his back for suspicious injuries, but found none. During her interview, Alexis told Gresbach that her parents sometimes gave her "whoppings," but denied receiving any marks or injuries. Gresbach asked Alexis to pull down her tights and lift up her dress, and Alexis did so. Gresbach examined her legs for any injuries, and found none. Gresbach finished the interviews and left the school.

Gresbach later spoke with the children's mother, who was very upset about what had happened at the school. The Bureau made attempts to meet with the parents and step-parents of Ian and Alexis, but the meetings never occurred. Because no injuries were observed on the children, the Bureau eventually closed the case.

On June 15, 2005, Plaintiffs (individually and on behalf of their minor children, Alexis and Ian) sued Gresbach, individually and in her official capacity, and Denise Revels Robinson (the Bureau's director) and Helene Nelson (the Bureau's secretary) in their official capacities. Plaintiffs alleged that the defendants (1) subjected each child to an unreasonable search and seizure at their private school, in violation of the Fourth Amendment; (2) violated all of the Plaintiffs' rights to familial relations under the Fourteenth Amendment; and (3) violated all of the Plaintiffs's rights to procedural due process under the Fourteenth Amendment. Plaintiffs also

challenged the constitutionality of Wis. Stat. § 48.981(3)(c)1
as applied, sought an injunction against defendants to
prohibit enforcement of the statute in a manner incon-
sistent with Plaintiffs' constitutional rights and to direct
defendants to amend their procedures and personnel
training, and requested a declaration that the last sen-
tence of § 48.981(3)(c)1 was unconstitutional. The defen-
dants responded that their conduct did not violate any
clearly established constitutional rights, and that there-
fore they were protected by qualified immunity. Both
parties moved for summary judgment.

On March 19, 2007, the district court granted partial
summary judgment in favor of the Plaintiffs, finding that
Gresbach violated the children's Fourth Amendment
rights to be free from unreasonable searches and seizures.
The court held that while Gresbach obtained voluntary
consent from Reetz to conduct interviews of the chil-
dren, Gresbach did not have consent to conduct the
searches of the children's bodies, thus violating their
rights to be free from unreasonable searches. The court
further found that those rights were clearly established at
the time of the alleged violation under *Heck*, in that a
reasonable child welfare worker would have known
that she lacked authority to conduct such a search. Accord-
ingly, the court denied Gresbach's motion for sum-
mary judgment under qualified immunity.[2]

---

[2] The district court dismissed all of Plaintiffs' claims for
equitable relief, which included all claims against Robinson
and Nelson, as well as supplemental state law claims—none of
which are issues before us today. The court further denied
defendants' motion for summary judgment on Plaintiffs' due

(continued...)

**III.**

We review a district court's denial of summary judgment on qualified immunity grounds *de novo. Sallenger v. Oakes*, 473 F.3d 731, 739 (7th Cir. 2007). We will affirm the district court's judgment if we find that a plaintiff "present[ed] a version of the facts that is supported by the evidence and under which defendants would not be entitled to qualified immunity." *Borello v. Allison*, 446 F.3d 742, 746 (7th Cir. 2006) (citation omitted). Under the qualified immunity analysis, an official performing discretionary functions is immune from suit if her "conduct could reasonably have been thought consistent with the rights she is alleged to have violated." *Id*. (internal quotations omitted).

When evaluating a qualified immunity claim, we must first decide whether, taken in the light most favorable to the plaintiffs, the facts show that the official's conduct violated a constitutional right. *Finkel v. Cruppenink*, 326 F.3d 903, 906 (7th Cir. 2003) (citing *Saucier v. Katz*, 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001)). "Only if the answer is affirmative does the court inquire whether the official enjoys qualified immunity." *Hosty v. Carter*, 412 F.3d 731, 733 (7th Cir. 2005). If a constitutional violation could be made out on a favorable view of the parties' submissions, the next step is to ask whether the right was "clearly established." *Id*. To be "clearly established," the contours of the right must be sufficiently clear that a reasonable official would under-

---

[2] (...continued)

process claims without prejudice, and granted a stay, pending this appeal.

stand that what she is doing violates that right. *Landstrom v. Illinois Dept. of Children and Family Services*, 892 F.2d 670, 675 (7th Cir. 1990) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1986)). If the right was "clearly established," the official is not entitled to qualified immunity from suit.

### A. Violation of a Constitutional Right

Our threshold inquiry is whether Gresbach violated Ian and Alexis's Fourth Amendment rights to be free from unreasonable searches. The Fourth Amendment, as applied to the states through the Fourteenth Amendment, protects individuals against unreasonable searches and seizures of their persons, homes, and effects, without a warrant supported by probable cause. *See* U.S. Const. amend. IV. The protections afforded by the Fourth Amendment apply not only to the activities of criminal authorities, but civil authorities as well, *New Jersey v. T.L.O.*, 469 U.S. 325, 335, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985), including child welfare workers. *Heck*, 327 F.3d at 509; *Daryl H. v. Coler*, 801 F.2d 893, 900 (7th Cir. 1986); *see also Brokaw v. Mercer County*, 235 F.3d 1000, 1010 n.4 (7th Cir. 2000) (finding that the Fourth Amendment protects students from unreasonable searches and seizures by public school officials); *Jones v. Hunt*, 410 F.3d 1221, 1225 (10th Cir. 2005) ("There is no 'social worker' exception to the Fourth Amendment.") (citation omitted); *Tenenbaum v. Williams*, 193 F.3d 581, 606 (2d. Cir 1999) (holding the Fourth Amendment doctrine applies to searches and seizures made in the context of child abuse investigations).

First we determine whether Gresbach's conduct constituted a "search" within the meaning of the Fourth Amend-

ment. "When the Fourth Amendment was ratified, as now, to 'search' meant 'to look over or through for the purpose of finding something; to explore; to examine by inspection. . . .'" *Heck*, 327 F.3d at 510 (quoting *Kyllo v. United States*, 533 U.S. 27, 33 n.1, 121 S.Ct. 2038, 150 L.Ed.2d 94 (2001)); *see Johnson v. Phelan*, 69 F.3d 144, 145 (7th Cir. 1995) (holding that observation of unclothed bodies is a form of a search under the Fourth Amendment). Within the context of child abuse investigations, physical examinations conducted by child welfare caseworkers, that include visual examinations of portions of a child's body which are normally covered by clothing, implicate Fourth Amendment concerns, and are within the scope of searches under the amendment. *Daryl H.*, 801 F.2d at 899-900. Thus, the visual observations of Ian's stomach and Alexis's legs by Gresbach to look for signs of abuse must be searches under the scope of the Fourth Amendment.

Of course, the Fourth Amendment prohibits only those searches that are unreasonable. *See Vernonia School Dist. 47J v. Acton*, 515 U.S. 646, 652, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995) ("As the text of the Fourth Amendment indicates, the ultimate measure of the constitutionality of a governmental search is reasonableness."); *Stanley v. Henson*, 337 F.3d 961, 964 (7th Cir. 2003) ("Included within the Fourth Amendment's protection is the right to be free from unreasonable searches of one's unclothed body."). To determine reasonableness under the Fourth Amendment, we balance the degree of the intrusion on the individual's privacy interests against the government's need for the search. *Shell v. United States*, 448 F.3d 951, 956 (7th Cir. 2006). "[W]hether a search is 'reasonable,' in the constitutional sense, will vary according to the context of the

search." *Daryl H.*, 801 F.2d at 900. Gresbach's searches of the children's bodies took place on private property, and *Heck* made clear that a warrantless search conducted on private property is presumptively unreasonable, whether the government's motivation is to investigate violations of criminal laws or breaches of other statutory standards, so long as the person has a reasonable expectation of privacy in the premises on which the search took place. *Heck*, 327 F.3d at 511 (citations omitted).

A reasonable expectation of privacy is present for Fourth Amendment purposes when (1) one exhibits an actual or subjective expectation of privacy, and (2) that expectation is one that society is prepared to recognize as reasonable. *United States v. Amaral-Estrada*, 509 F.3d 820, 826 (7th Cir. 2007). Even a limited search of a person is a substantial invasion of privacy. "A search of a child's person or of a closed purse or other bag carried on her person . . . is undoubtedly a severe violation of subjective expectation of privacy." *Daryl H.*, 801 F.2d at 900 (quoting *T.L.O.*, 469 U.S. at 330, 105 S.Ct. 733). However, it is unnecessary to show a subjective expectation of privacy in instances of searches or seizures of young children—it is more appropriate to consider whether the parents manifested a subjective expectation of privacy in the premises within which the search took place. *Heck*, 327 F.3d at 512. Private schools, by their very operation, exhibit a subjective expectation of privacy in their premises. *Id.* at 511. The Plaintiffs manifested a subjective expectation of privacy by placing their children in Good Hope Academy, and entrusting their children to the care of the school's officials *in loco parentis*. *See id*.

Moreover, an expectation of privacy is objectively reasonable where parents who place their children in

private schools expect that the parents' express delegation of parental authority to school officials will be both acknowledged and respected by government actors. *Heck*, 327 F.3d at 512. We find that Plaintiffs had a legitimate expectation of privacy at Good Hope, and therefore the searches of the children's bodies to investigate child abuse were presumptively unreasonable, unless they fall within an exception to the warrant requirement of the Fourth Amendment. *See id*. at 511.

Gresbach argues that it is objectively reasonable under the Fourth Amendment for a child welfare agent to visually inspect these areas of a child's body for injuries after receiving general consent from the child's private school principal to investigate child abuse. An established exception to the warrant requirement is a search conducted pursuant to consent. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); *United States v. Moore*, 375 F.3d 580, 585 (7th Cir. 2004). We are aware that this exception is grudgingly granted because "the privacy interests protected by the Fourth Amendment are to be jealously guarded." *Heck*, 327 F.3d at 513 (quoting *Wilson v. Health & Hosp. Corp. of Marion County*, 620 F.2d 1201, 1209 (7th Cir. 1980)). A consensual search is manifestly reasonable under the Fourth Amendment as long as it remains within the scope of consent. *See Florida v. Jimeno*, 500 U.S. 248, 251, 111 S.Ct. 1801, 114 L.Ed.2d 297 (1991). The scope of consent is "limited by the breadth of actual consent, and whether the search remained within the boundaries of the consent is a question of fact to be determined from the totality of all the circumstances." *United States v. Long*, 425 F.3d 482, 486 (7th Cir. 2005) (citation omitted). "In determining the scope of a defendant's consent, we

apply an objective standard: 'what would the typical reasonable person have understood by the exchange between the offic[ial] and the [consentor]?'" *Id.* (quoting *United States v. Raney*, 342 F.3d 551, 556 (7th Cir. 2003)).

Applied to the case *sub judice*, the inquiry is whether it was reasonable for Gresbach to believe that Reetz's consent to interview the children included consent to conduct a search of the children's bodies. We find that it was not. Based on Gresbach's representations that she needed to "see the children" to investigate a child abuse allegation, and that Reetz need not be present for the interview, Reetz allowed Gresbach to speak to the children privately in order to obtain their statements about an allegation of child abuse. A reasonable person would not have interpreted this to mean that Reetz authorized Gresbach to search the children's bodies. It is undisputed that Gresbach did not ask Reetz for permission to search the children for injuries. Gresbach argues that Reetz's "general consent" to interview included the consent to inspect the children's bodies, but she cites to no supporting relevant authority, and we are unaware of any case under Fourth Amendment jurisprudence that proscribes this notion.

In some instances, the line implicating Fourth Amendment concerns is blurred when it applies to the government and child abuse investigations. *See Heck*, 327 F.3d at 514 (acknowledging that there are circumstances in which the law of warrant and probable cause does not work effectively in the child removal or child examination context); *Landstrom*, 892 F.2d at 676 (holding that a search or seizure of a child by a state social worker must be "reasonable," but that does not necessarily require probable cause or a warrant); *Daryl H.*, 801 F.2d at

902 (stating that the government must fulfill its responsi-
bility to protect the young under difficult circumstances).
Recognizing the sensitive nature of these types of in-
vestigations, officials may make a search or seizure
under exigent circumstances, where they have reason to
believe life or limb is in jeopardy.[3] *See Brokaw*, 235 F.3d at
1010. We do not exempt child welfare workers from
adhering to basic Fourth Amendment principles under
non-exigent circumstances—to do so would be impru-
dent. In these circumstances, caseworkers can take pre-
liminary steps short of searches, such as interviewing
the child and a parent, or obtaining a warrant either
personally to conduct a search or to have a doctor per-
form the search. *See Roe v. Texas Dept. of Protective and
Regulatory Services*, 299 F.3d 395, 407 (5th Cir. 2002).

Gresbach advocates the position that a warrant is for
police officers, not caseworkers, and that the probable
cause and warrant requirement are more appropriately
geared towards the investigation of the abusers, not the
victims. We disagree. The Fourth Amendment preserves
the right to be free from warrantless searches by the
government, without limiting that right to one type of
official. *See Calabretta v. Floyd*, 189 F.3d 808, 813-14 (9th Cir.

---

[3] *Heck* foreclosed the justification of the "special needs"
exemption in this context, because states have "the ability to take
immediate action to ensure the physical safety of a child
suspected of abuse who is located on private property" through
the exigent circumstances exception to the warrant require-
ment of the Fourth Amendment. *Heck*, 327 F.3d at 517 n. 20.
While it seems unlikely from the record that Gresbach could
have reasonably suspected the children's safety was at risk,
she does not raise this issue on appeal.

1999). The requirement that a child welfare worker obtain the equivalent of a warrant before conducting a search (absent exigent circumstances) can effectively protect children, without having to excuse workers from obtaining advance judicial approval of searches and seizures. *Heck*, 327 F.3d at 514; *see Tenenbaum*, 193 F.3d at 604. Additionally, nothing in the record supports Gresbach's belief that obtaining a warrant would have delayed and thus compromised her investigation.

Because Gresbach conducted a search of each child on private property without consent, a warrant or probable cause, or exigent circumstances, Ian and Alexis's Fourth Amendment rights to be free from unreasonable searches were violated.

### B.  Clearly Established Law

Despite her participation in this constitutionally impermissible conduct, Gresbach may nevertheless be shielded from liability for civil damages if Plaintiffs fail to meet their burden of proving that Gresbach's actions violated clearly established statutory or constitutional rights of which a reasonable person would have known. *Hope v. Pelzer*, 536 U.S. 730, 739, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)); *Sonnleitner v. York,* 304 F.3d 704, 716-17 (7th Cir. 2002). In determining whether a defendant's alleged actions violated a clearly established right, courts may properly take into account any information the defendant should have reasonably obtained. *Jones v. Wilhelm*, 425 F.3d 455, 461 (7th Cir. 2005). Moreover, the salient question is whether the law at the time of the disputed conduct gave defendants fair

warning that their alleged treatment of plaintiffs was unconstitutional. *Id*.; *see also Creighton*, 483 U.S. at 640, 107 S.Ct. 3034 ("This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, . . . but it is to say that in the light of pre-existing law the unlawfulness must be apparent.") (internal citations omitted).

As we stated above, the structures of the Fourth Amendment apply to social workers. *Heck*, 327 F.3d at 511. Plaintiffs argue that our decision in *Heck* precludes Gresbach's understanding of her rights to conduct a child abuse investigation under § 48.981(3)(c)1, and we agree. "[T]o the extent § 48.981(3)(c)1 authorizes government officials to conduct an investigation of child abuse on private property without a warrant or probable cause, consent, or exigent circumstances, the statute is unconstitutional." *Id*. at 515-16. Considering the facts above in the light most favorable to the Plaintiffs, we find that a reasonable child welfare worker would have known that conducting a search of a child's body under his clothes, on private property, without consent or the presence of any other exception to the warrant requirement of the Fourth Amendment, is in direct violation of the child's constitutional right to be free from unreasonable searches.

Gresbach argues that *Heck* is distinguishable from this case, because *Heck* did not address the issue of scope of consent in the context of child abuse investigations. However, a general constitutional rule already identified may apply with obvious clarity to the specific conduct in question, even though the very action in question has not previously been held unlawful. *Hope*, 536 U.S. at 741, 122 S.Ct. 2508 (quoting *Lanier*, 520 U.S. 259, 270-71, 117 S.Ct. 1219, 137 L.Ed.2d 432 (1997)); *see also Jones*, 410

F.3d at 1230 (holding that officials committing outrageous, yet *sui generis*, constitutional violations ought not to shield their behavior behind qualified immunity simply because another official has not previously had the audacity to commit a similar transgression). Officials can still be on notice that their conduct violates established law even in novel factual circumstances. *Hope*, 536 U.S. at 741, 122 S.Ct. 2508. In this case, it was clearly established that the scope of consent to interview does not extend to a search of an individual's body under *Jimeno* and its progeny.

Gresbach further argues (as the caseworkers did in *Heck*) that we should apply the "reasonableness" framework we laid out in *Daryl H.*, where we held that the constitutionality of a visual inspection of a child's body who may be a victim of child abuse should be evaluated under the reasonableness test of the Fourth Amendment. *Daryl H.*, 892 F.2d at 902 ("[U]nder the circumstances of that particular search in a public school, we could not say that a visual inspection of a child's body can only be performed if a social worker has probable cause or obtained a warrant."). We declined to accept this argument in *Heck*, and we do the same here. The key difference between the searches in *Daryl H.* and in *Heck* was that the search in *Daryl H.* took place on public school grounds with the consent of public school officials, whereas in *Heck*, as here, the search took place on private property. *Heck*, 327 F.3d at 514. *Heck* found that *Daryl H.* stood for the proposition that a lower standard of scrutiny applies to searches and seizures conducted by government officials on public school property. *Id.* (citing *Brokaw*, 235 F.3d at 1011). This case falls squarely within the scope of *Heck*, as the search took place at a private school.

While we recognize that "child welfare caseworkers are often called upon to make difficult decisions without the benefit of extended deliberation" in order to prevent "the most vulnerable members of society, children of tender years, from being physically abused," *Heck*, 327 F.3d at 525, we do not believe that requiring a child welfare caseworker to act in accordance with basic Fourth Amendment principles is an undue burden on the child welfare system, particularly when it is necessary to conduct an examination of a child's body, which is undoubtedly "frightening, humiliating, and intrusive" to the child. At the time Gresbach conducted the searches at Good Hope in 2004, there was a clearly established doctrine as to what actions a Bureau caseworker must take when conducting a child abuse investigation at a private school. Today we reiterate *Heck*'s definitive holding, along the lines of the Fourth Amendment principles outlined above, that it is a violation of a child's constitutional rights to conduct a search of a child at a private school without a warrant or probable cause, consent, or exigent circumstances.

## CONCLUSION

For the foregoing reasons, the judgment of the district court is AFFIRMED.

USCA-02-C-0072—5-19-08