In the

# United States Court of Appeals

## For the Seventh Circuit

No. 09-2279

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

LEE ANTON JACKSON,

*Defendant-Appellant*.

Appeal from the United States District Court
for the Western District of Wisconsin.
No. 08-CR-069-C—**Barbara B. Crabb**, *Chief Judge*.

ARGUED JANUARY 22, 2010—DECIDED MARCH 12, 2010

Before RIPPLE and ROVNER, *Circuit Judges*, and ST. EVE, *District Judge*.[1]

ST. EVE, *District Judge*. On March 9, 2008, police found a gun in a computer case belonging to Defendant Lee Anton Jackson, who had prior felony convictions. A

[1] The Honorable Amy J. St. Eve, District Judge for the United States District Court, Northern District of Illinois, sitting by designation.

grand jury subsequently returned an indictment charging Defendant Jackson with one count of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). After Defendant entered a conditional guilty plea, the district court sentenced Defendant to 120 months in prison. On appeal, Defendant Jackson challenges the search of the computer case and the district court's denial of his requests to (1) pursue an "innocent possession" defense and (2) apply Guidelines Section 5K2.11. We affirm the district court in all respects.

## FACTUAL BACKGROUND

In early 2008, Madison, Wisconsin Police Department officers suspected that individuals were engaging in fencing at a strip mall located at 1900 South Park Street in Madison. Defendant Jackson, who has prior felony convictions, was one of the suspects. Police officers, including David Dexheimer, had previously interacted with Defendant and his mother, DaFondeau Eaton, and Eaton had complained about Madison police officers to certain city officials. Like Defendant Jackson, Eaton is a convicted felon.

As part of the Madison Police Department's investigation of the Park Street strip mall, in the early evening of March 9, 2008, Officer Dexheimer and Officer Steven Chvala were conducting surveillance of the strip mall. Officer Dexheimer was parked behind the strip mall, while Officer Chvala was parked nearby. At around 7:00 p.m., officers observed a car that was registered to Defendant Jackson pull into the strip mall parking lot, and

Officer Dexheimer radioed to Officer Chvala that Jackson was a suspect in the investigation.

At around 8:15 p.m., a woman drove into the parking lot, got out of her car, and approached Defendant's car. After he received the license plate and a description of the driver from Officer Chvala, Officer Dexheimer reported that the car belonged to Eaton, who matched the description of the driver and who did not possess a valid driver's license. Police observed Defendant give Eaton a black computer case, walk with Eaton to her car, and embrace Eaton. Eaton then drove out of the parking lot with the case.

Officer Dexheimer followed Eaton, intending to stop her for operating a vehicle with a revoked license and because he wanted to see what the case contained. Officer Dexheimer pulled Eaton over, explained to Eaton that he stopped her because she was driving without a license, and asked Eaton what she had done at the strip mall. Eaton told Officer Dexheimer that Defendant Jackson had let her borrow his computer so that she could download certain pictures of her grandchild. Officer Dexheimer then asked if he could look at the case, and Eaton agreed, even though—unbeknownst to the police— Defendant had purportedly told her not to allow anyone to open the computer. Eaton handed Officer Dexheimer the case without limiting her consent to search the case or computer.[2]

_____

[2] The following suppression hearing testimony is especially relevant to our analysis:

(continued...)

---

[2] (...continued)

Question: Officer, did you ask, since you didn't know what was in the attache case beforehand, did you ask to search a computer or did you ask to search the bag?

Answer: I know I didn't ask to search a computer. I can't give a quotation on exactly what I said to her, but I know I did not ask to search a computer.

Question: Did she hand you the attache case as a whole or did she take out the computer and hand it to you?

Answer: She handed the whole bag to me with its contents.

Question: What was your understanding that she was allowing you to do when she handed you the whole bag and contents?

Answer: That she was allowing me to check the whole bag.

Question: Okay. Did she ever indicate that you could not search the whole bag?

Answer: She never said, she never objected.

\* \* \*

Question: And, sir, once she handed you the black case and you got it from her, did you ask her, did you ask her if you could look inside and she said that you could?

Answer: Yes.

Question: Okay. And when you said inside, what were you referring to?

(continued...)

Officer Dexheimer then removed the computer from the case and opened the computer with Eaton's assistance, attempting to find the serial number. When Officer Dexheimer could not find the serial number, he unzipped an exterior pocket on the computer case and found a handgun. Eaton also saw the gun and proclaimed—credibly, according to the magistrate judge who presided over the suppression hearing—that she had no idea that the gun was there. Officer Dexheimer then radioed news of the gun to Officer Chvala, who—along with several other officers—arrested Defendant. Defendant gave a statement to officers at the time of his arrest. Defendant Jackson subsequently was indicted on April 28, 2008, on one count of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1).

## PROCEDURAL HISTORY

Defendant filed a motion ("Motion") to suppress Defendant's post-arrest statement and all evidence that the police had obtained as a result of searching the computer case. After holding a suppression hearing, the magistrate judge issued an eleven-page Report and

---

[2]  (...continued)

    Answer:  I was referring to the case. She told me that she—she told me that what she received from him was a case with a computer in it. She handed me the whole case. Asked her if I could look inside the case.

(Suppression Hr'g Tr. at 75, 77.)

Recommendation, finding that the search of the computer case was constitutional, and recommending that the district court deny the Motion.

After the magistrate judge issued his Report and Recommendation but before the district court ruled on it, the government informed Defendant Jackson that it would not use Defendant's post-arrest statement at trial. Defendant's counsel then informed the district court that he was not objecting to the magistrate judge's recommendation to deny suppression of Defendant's post-arrest statement due to the government's intention to not use it. The district court adopted the Report and Recommendation and denied the Motion in its entirety.

Defendant also filed a motion to present evidence and to instruct the jury on his proposed defense of "innocent possession." The district court denied that motion "because the court of appeals does not recognize an innocent possession defense to a § 922(g) charge" and, even if it did, "defendant's proffered facts do not fit with the court of appeals' dicta on the limits of such a defense." (Nov. 12, 2008, Op. & Order at 1.)

Defendant entered a conditional guilty plea, reserving his right to appeal the denial of his motions to suppress and to present a defense. At sentencing, Defendant argued for application of Guidelines Section 5K2.11 because, he argued, Congress did not seek to prohibit his conduct in enacting Section 922. The district court declined to apply Section 5K2.11, granted the government's motion brought pursuant to Section 5K1.1, and sentenced Defendant to 120 months' imprisonment,

60 months below the lower-end of the applicable advisory Guidelines range.

## STANDARD OF REVIEW

We apply a dual standard of review to a district court's denial of a suppression motion: the Court reviews legal conclusions *de novo* and findings of fact for clear error. *United States v. Huddleston*, 593 F.3d 596, 600 (7th Cir. 2010); *United States v. James*, 571 F.3d 707, 713 (7th Cir. 2009); *United States v. Groves*, 530 F.3d 506, 509 (7th Cir. 2008); *United States v. Tyler*, 512 F.3d 405, 409 (7th Cir. 2008) ("Historical facts are reviewed for clear error, and 'due weight' deference is given 'to [the] inferences drawn from those facts by resident judges and local law enforcement officers.'" (quoting *Ornelas v. United States*, 517 U.S. 690, 699, 116 S.Ct. 1657, 1663 (1996), with brackets in original)). "'Because the resolution of a motion to suppress is a fact-specific inquiry, we give deference to credibility determinations of the district court, who had the opportunity to listen to testimony and observe the witnesses at the suppression hearing.'" *Groves*, 530 F.3d at 510 (quoting *United States v. Hendrix*, 509 F.3d 362, 373 (7th Cir. 2007)); *see also United States v. Bernitt*, 392 F.3d 873, 878 (7th Cir. 2004). "A factual finding is clearly erroneous only if, after considering all the evidence, we cannot avoid or ignore a 'definite and firm conviction that a mistake has been made.'" *United States v. Burnside*, 588 F.3d 511, 517 (7th Cir. 2009) (quoting *United States v. Marshall*, 157 F.3d 477, 480-81 (7th Cir. 1998)).

We review *de novo* a district court's refusal to allow a defendant's theory of defense and the corresponding jury instruction. *See United States v. Kilgore*, 591 F.3d 890, 893 (7th Cir. 2010); *United States v. Canady*, 578 F.3d 665, 672 (7th Cir. 2009); *United States v. Prude*, 489 F.3d 873, 882 (7th Cir. 2007) (citing *United States v. Eberhart*, 467 F.3d 659, 666 (7th Cir. 2006)).

> "A defendant is entitled to a jury instruction as to his or her particular theory of defense provided: (1) the instruction presents an accurate statement of the law; (2) the instruction reflects a theory that is supported by the evidence; (3) the instruction reflects a theory which is not already part of the charge; and (4) the failure to include the instruction would deny the appellant a fair trial."

*Prude*, 489 F.3d at 882 (quoting *Eberhart*, 467 F.3d at 666); *see also Canady*, 578 F.3d at 672.

Finally, "[w]e review the reasonableness of a sentence under an abuse-of-discretion standard." *United States v. Poetz*, 582 F.3d 835, 837 (7th Cir. 2009) (citing *Gall v. United States*, 552 U.S. 38, 128 S.Ct. 586, 591, 597 (2007)). "A below-guidelines sentence, like a within-guidelines one, is presumed reasonable against a defendant's challenge that it is too high." *Poetz*, 582 F.3d at 837 (citing *United States v. Liddell*, 543 F.3d 877, 885 (7th Cir. 2008), *United States v. Wallace*, 531 F.3d 504, 507 (7th Cir. 2008) ("We have never deemed a below-range sentence to be unreasonably high."), and *United States v. George*, 403 F.3d 470, 473 (7th Cir. 2005) ("It is hard to conceive of below-range sentences that would be unreasonably high.")). "Although

'[t]he concept of departures has been rendered obsolete in post-*Booker* sentencing . . . the district court may apply those departure guidelines by way of analogy in analyzing the section 3553(a) factors.'" *United States v. Schroeder*, 536 F.3d 746, 756 (7th Cir. 2008) (quoting *United States v. Miranda*, 505 F.3d 785, 792 (7th Cir. 2007)).

## ANALYSIS

Defendant makes three arguments on appeal: (1) the district court should have suppressed evidence obtained from Officer Dexheimer's search because (a) Eaton did not have actual or apparent authority to search the computer bag, and (b) even if she did, Officer Dexheimer exceeded the scope of that authority, which was limited to searching for the computer; (2) the district court should have allowed Defendant's proposed "innocent possession" theory of defense; and (3) the district court should have applied Guidelines Section 5K2.11 because Defendant's possession was not within the heartland of cases that Congress sought to encompass by enacting 18 U.S.C. § 922(g).[3] We address each argument in turn.

---

[3] While Defendant argues on appeal that the district court should have suppressed his post-arrest statement (Opening Br. at 27-28), Defendant did not raise that argument in the district court "because the government [had] advised him it [did] not intend to use those statements at trial." (Oct. 28, 2008, Order at 1.) He has accordingly waived it. *See United States v. Conner*, 583 F.3d 1011, 1026-27 (7th Cir. 2009);

(continued...)

**I.  Consent to Search**

**A.  Actual or Apparent Authority**

The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures." U.S. CONST. amend. IV. "The touchstone of the Fourth Amendment is reasonableness." *Florida v. Jimeno*, 500 U.S. 248, 250, 111 S.Ct. 1801, 1803 (1991); *see also James*, 571 F.3d at 713. Accordingly, the Fourth Amendment proscribes searches and seizures only when they are unreasonable. *Jimeno*, 500 U.S. at 250, 111 S.Ct. at 1803; *see also James*, 571 F.3d at 713. "In the typical case, a 'seizure of personal property [is] per se unreasonable within the meaning of the Fourth Amendment unless it is accomplished pursu-

---

³ (...continued)
*United States v. Kincaid*, 571 F.3d 648, 654-55 (7th Cir. 2009). Additionally, Defendant appears to suggest that stopping Eaton's car was improper because "the reason for stopping Ms. Eaton proved simply a pretext." (Opening Br. at 25.) Even if true, however, this would not affect the legality of stopping Eaton's car because "an arresting officer's state of mind (except for the facts that he knows) is irrelevant to the existence of probable cause." *Devenpeck v. Alford*, 543 U.S. 146, 153, 125 S.Ct. 588, 593 (2004) (citing *Whren v. United States*, 517 U.S. 806, 819, 116 S.Ct. 1769, 1777 (1996)); *see also United States v. Loera*, 565 F.3d 406, 410-11 (7th Cir. 2009) (noting that *Whren* " 'foreclose[d] any argument that the constitutional reason-ableness of traffic stops depends on the actual motivations of the individual officers involved' " (quoting *Whren*, 517 U.S. at 813, 116 S.Ct. 1769, with brackets in original)).

ant to a judicial warrant issued upon probable cause and particularly describing the items to be seized.'" *James*, 571 F.3d at 713 (quoting *United States v. Place*, 462 U.S. 696, 701, 103 S.Ct. 2637, 2641 (1983), with brackets in original); *see also Bernitt*, 392 F.3d at 876.

A well-recognized exception to the warrant requirement applies, however, when someone consents to a search. *See James*, 571 F.3d at 713. The government has the burden of proving consent by a preponderance of the evidence.[4] *See Bumper v. North Carolina*, 391 U.S. 543, 548, 88 S.Ct. 1788, 1792 (1968); *James*, 571 F.3d at 714.

The consent of one who possesses common authority, or who appears to have common authority, "over premises or effects is valid as against the absent, nonconsenting person with whom that authority is shared,'" *Georgia v. Randolph*, 547 U.S. 103, 110, 126 S.Ct. 1515, 1521 (2006) (quoting *United States v. Matlock*, 415 U.S. 164, 170, 94 S.Ct. 988, 993 (1974)), because "it is no doubt reasonable for the police to conduct a search once they have been permitted to do so," *Jimeno*, 500 U.S. at 250-51, 111 S.Ct. at 1803. *See also Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S.Ct. 2041, 2043-44 (1973); *Coolidge v. New Hampshire*, 403 U.S. 443, 488, 91 S.Ct. 2022, 2049 (1971); *Frazier v. Cupp*, 394 U.S. 731, 740, 89 S.Ct. 1420, 1425 (1969) ("Since Rawls was a joint user of the bag, he clearly had authority to

---

[4] While the government also bears the burden of proving that consent was given voluntarily, *James*, 571 F.3d at 714; *Bernitt*, 392 F.3d at 876-77, Defendant does not argue that Eaton consented involuntarily.

consent to its search"); *James*, 571 F.3d at 714; *Groves*, 530 F.3d at 509.

Someone has apparent authority if "the facts available to the officer at the moment . . . warrant a man of reasonable caution in the belief that the consenting party had authority over the premises." *Illinois v. Rodriguez*, 497 U.S. 177, 188, 110 S.Ct. 2793, 2801 (1990) (internal quotation omitted); *see also United States v. Brown*, 328 F.3d 352, 356 (7th Cir. 2003); *United States v. Jensen*, 169 F.3d 1044, 1049 (7th Cir. 1999) ("The officers' reasonable belief that the person consenting to the search had authority to do so is all that is necessary for a consent search to be valid."); *United States v. Rosario*, 962 F.2d 733, 738 (7th Cir. 1992) (noting that "the Fourth Amendment makes no insistence that the decisions of government agents always be correct. Police officers would be held to an impossibly high standard if expected to carry out their duties infallibly, and the courts have long recognized that mistakes will occur." (internal citation omitted)). An individual's consent remains valid, and items that law enforcement find as a result of the consent are admissible, until someone withdraws the consent. *Forman v. Richmond Police Dept.*, 104 F.3d 950, 960 (7th Cir. 1997).

As this Court has previously observed, the third-party consent exception to the warrant requirement is premised on the assumption of the risk concept. *See James*, 571 F.3d at 713; *Groves*, 530 F.3d at 509. Accordingly, common-authority rights under the Fourth Amendment can be broader than the rights that property law provides. *Randolph*, 547 U.S. at 110, 126 S.Ct. at 1521. As the Supreme Court has reasoned:

> The authority which justifies the third-party consent does not rest upon the law of property, with its attendant historical and legal refinements, but rests rather on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched.

*Matlock*, 415 U.S. at 171 n.7, 94 S.Ct. at 993 (internal citations omitted); *see also Frazier*, 394 U.S. at 740, 89 S.Ct. at 1425 ("Petitioner argues that Rawls only had actual permission to use one compartment of the bag and that he had no authority to consent to a search of the other compartments. We will not, however, engage in such metaphysical subtleties in judging the efficacy of Rawls' consent. Petitioner, in allowing Rawls to use the bag and in leaving it in his house, must be taken to have assumed the risk that Rawls would allow someone else to look inside."); *United States v. Basinski*, 226 F.3d 829, 834 (7th Cir. 2000) ("[W]here a defendant allows a third party to exercise actual or apparent authority over the defendant's property, he is considered to have assumed the risk that the third party might permit access to others, including government agents.").

"For purposes of searches of closed containers, mere possession of the container by a third party does not necessarily give rise to a reasonable belief that the third party has authority to consent to a search of its contents."

*Basinski*, 226 F.3d at 834. "Rather, apparent authority turns on the government's knowledge of the third party's use of, control over, and access to the container to be searched, because these characteristics are particularly probative of whether the individual has authority over the property." *Id.* Accordingly, we conduct a fact-specific inquiry to decide whether someone had actual or apparent authority to consent to a search. *See Groves*, 530 F.3d at 509-10; *Basinski*, 226 F.3d at 834-35 (observing that "it is less reasonable for a police officer to believe that a third party has full access to a defendant's purse or a briefcase than, say, an open crate").

Because Eaton had the apparent authority to consent to a search of the computer case, the district court properly denied Defendant's suppression motion. First, there is no evidence that Officer Dexheimer was aware of anything that would have alerted him that Eaton did not have authority to consent to the search. As such, the cases on which Defendant relies to argue lack of authority are easily distinguishable. *See Basinski*, 226 F.3d at 835 (before opening the case, "the agents learned that [the defendant] implicitly, if not explicitly, instructed [the third party] to never open the briefcase and to destroy its contents rather than allow anyone else to peer inside"); *United States v. Jaras*, 86 F.3d 383, 389 (5th Cir. 1996) ("The government presented no evidence of joint access or control at the suppression hearing."); *United States v. Infante-Ruiz*, 13 F.3d 498, 505 (1st Cir. 1994) (someone consented to a general search of a car but stated, without indicating that he had authority over it, that a briefcase in the locked trunk belonged to the defendant); *United*

*States v. Block*, 590 F.2d 535, 541 (4th Cir. 1978) (the police "specifically confronted a secured container that required force to open and a custodian-owner of the general premises who both asserted the absent person's claim of privacy over it and disclaimed for herself any shared right to access it"). Second, Eaton told Officer Dexheimer during the traffic stop that Defendant had authorized her to take the computer and computer case, and Officer Chvala had previously observed Defendant freely provide the computer case to Eaton. Officer Dexheimer therefore had a reasonable basis for believing that Eaton had the authority to consent to the search.

### B. Scope of Consent

A consensual search is reasonable under the Fourth Amendment so long as it remains within the scope of consent. *Michael C. v. Gresbach*, 526 F.3d 1008, 1015 (7th Cir. 2008). "The scope of consent is 'limited by the breadth of actual consent, and whether the search remained within the boundaries of the consent is a question of fact to be determined from the totality of all the circumstances.'" *Id.* (quoting *United States v. Long*, 425 F.3d 482, 486 (7th Cir. 2005)). The standard for measuring the scope of consent under the Fourth Amendment is one of objective reasonableness and asks what the typical reasonable person would have understood by the exchange between the law enforcement agent and the person who gives consent. *Jimeno*, 500 U.S. at 251, 111 S.Ct. at 1803-04; *see also Gresbach*, 526 F.3d at 1015 (same); *United*

*States v. Melgar*, 227 F.3d 1038, 1041 (7th Cir. 2000) ("Generally, consent to search a space includes consent to search containers within that space where a reasonable officer would construe the consent to extend to the container.").

"The scope of a search is generally defined by its expressed object." *Jimeno*, 500 U.S. at 251, 111 S.Ct. at 1804; *see also United States v. Breit*, 429 F.3d 725, 730 (7th Cir. 2005). Furthermore, a person may "delimit as he chooses the scope of the search to which he consents. But if his consent would reasonably be understood to extend to a particular container, the Fourth Amendment provides no grounds for requiring a more explicit authorization." *Jimeno*, 500 U.S. at 252, 111 S.Ct. at 1804 (in upholding search of paper bag when a suspect gave consent to search the car in which the bag was located, noting that the suspect "did not place any explicit limitation on the scope of the search"); *see also Bernitt*, 392 F.3d at 877. Law enforcement agents may not obtain someone's consent to search by misrepresenting that they intend to look only for certain specified items and subsequently use that consent to justify a general exploratory search. *Breit*, 429 F.3d at 730 (quoting *United States v. Dichiarinte*, 445 F.2d 126, 129 (7th Cir. 1971)).

The district court properly concluded that Officer Dexheimer did not exceed the scope of Eaton's consent. Where someone with actual or apparent authority consents to a general search, law enforcement may search anywhere within the general area where the sought-after item could be concealed. *See Groves*, 530 F.3d

at 511 (where officers obtained third-party consent to search a room for a gun, they could look in a night stand drawer); *United States v. Wilburn*, 473 F.3d 742, 745 (7th Cir. 2007) (because police had third-party consent to search a room for a gun, they could properly look inside an unlocked duffel bag located in the room); *Melgar*, 227 F.3d at 1042 (where a third party consented to a search of a room, officers could search inside a purse that was located in the room for counterfeit money); *United States v. Saadeh*, 61 F.3d 510, 518 (7th Cir. 1995) (a third party's consent to search a room allowed the officers to search for money in a toolbox and desk drawer within the room). Eaton consented to the officer's request to search the bag, and she placed no limit on the extent of the search. Furthermore, to the extent Defendant argues that the objective of the search limited the scope of Eaton's consent, Officer Dexheimer was searching not only for a computer, but also for evidence of the computer's serial number. That serial number, together with a power cord and other computer equipment, could have been located anywhere in the computer case. As such, Officer Dexheimer did not exceed the scope of Eaton's consent.

## II. "Innocent Possession" Defense

Defendant next argues that the district court erred in denying his request to raise an "innocent possession" defense. Defendant asserts that, because he was moving to Atlanta, Georgia, which has a high crime rate, his friend "insisted on giving him a .357 handgun." (Opening

Br. at 30.) According to Defendant, although he declined his friend's offer, his friend "left the firearm behind without permission." (*Id.*) Defendant further contends that, "because of the Madison Police Department's antagonistic relationship with his family," he "contacted his mother in order to get rid of the gun." (*Id.*) Because Eaton was also a felon, however, Defendant claims that he intended to have Eaton give the firearm to someone who was not a felon to turn it over to law enforcement. (*Id.*)

Defendant's innocent possession argument fails for two reasons. First, we have not recognized such a defense and decline to do so in this case. *See United States v. Kilgore*, 591 F.3d 890, 894 n.1 (7th Cir. 2010); *United States v. Matthews*, 520 F.3d 806, 810-11 (7th Cir. 2008) (holding that possessing a firearm even "for a brief period of time is sufficient to constitute possession within the meaning of section 922"); *United States v. Hendricks*, 319 F.3d 993, 1007 (7th Cir. 2003). Second, Defendant's actions would not support an innocent possession defense because he did not immediately seek to submit the firearm to law enforcement. *See Hendricks*, 319 F.3d at 1007 (noting in dicta the minimum requirements of such a defense).

> "A defendant is entitled to a jury instruction as to his or her particular theory of defense provided: (1) the instruction presents an accurate statement of the law; (2) the instruction reflects a theory that is supported by the evidence; (3) the instruction reflects a theory which is not already part of the charge; and (4) the failure to include the instruction would deny the appellant a fair trial."

*Prude*, 489 F.3d at 882 (quoting *Eberhart*, 467 F.3d at 666); *see also Hendricks*, 319 F.3d at 1005-06; *United States v. Elder*, 16 F.3d 733, 738 (7th Cir. 1994). Indeed, a district court judge may, and often should, preclude a defendant from introducing evidence of a proposed defense where the defendant cannot establish all elements of that defense. *United States v. Haynes*, 143 F.3d 1089, 1090 (7th Cir. 1998) (citing *Matthews v. United States*, 485 U.S. 58, 63, 108 S.Ct. 883, 886-87 (1988), and *United States v. Bailey*, 444 U.S. 394, 415-17, 100 S.Ct. 624, 637-38 (1980)).

We have previously limited the "innocent possession" defense in a Section 922(g)(1) case to situations in which the defendant can establish a justification defense (*i.e.*, necessity, duress or self defense). *Hendricks*, 319 F.3d at 1007 (citing *United States v. Perez*, 86 F.3d 735 (7th Cir. 1996), *United States v. Toney*, 27 F.3d 1245 (7th Cir. 1994), and *Elder*, 16 F.3d 733). In *Hendricks* we noted in dicta, however, that if we were to adopt a distinct "innocent possession" defense, two requirements would have to be satisfied to trigger it:

> "The record must reveal that (1) the firearm was attained innocently and held with no illicit purpose and (2) possession of the firearm was transitory—*i.e.*, in light of the circumstances presented, there is a good basis to find that the defendant took adequate measures to rid himself of possession of the firearm as promptly as reasonably possible. In particular, a defendant's actions must demonstrate both that he had the intent to turn the weapon over to the police and that he was pursuing such an intent with immediacy and through a reasonable course of conduct."

*Hendricks*, 319 F.3d at 1007 (quoting *United States v. Mason*, 233 F.3d 619, 624 (D.C. Cir. 2000)). Where a Section 922(g) defendant does not immediately seek to turn a firearm over to law enforcement, an innocent possession instruction is not warranted. *See Hendricks*, 319 F.3d at 1007-08.

Even if we were to recognize an innocent possession defense, Defendant's proffered facts come nowhere close to the hypothetical scenarios to which courts have found that an innocent possession defense might apply. In *United States v. Wilson*, 922 F.2d 1336 (7th Cir. 1991), for example, we mentioned in dicta that an innocent possession instruction might be warranted if a felon momentarily handles a gun while taking it away from children who were playing with it. *Id.* at 1338-39. Similarly, the Second Circuit has noted that such an instruction might be appropriate where "a felon who notices 'a police officer's pistol slip to the floor while the officer was seated at a lunch counter,' picks up the weapon, and immediately returns it to the officer." *United States v. Williams*, 389 F.3d 402, 405 (2d Cir. 2004) (quoting *United States v. Paul*, 110 F.3d 869, 872 (2d Cir. 1997)); *see also United States v. Mason*, 233 F.3d 619, 624-25 (D.C. Cir. 2001) (after observing that "[t]he innocent possession defense to a § 922(g)(1) charge is necessarily narrow," finding that an innocent possession instruction should be given with respect to a defendant who, upon finding a weapon, drove directly to deliver it to a law enforcement officer without attempting to hide it).

The facts of this case do not fall into either of these categories. Initially, Defendant's contention that he

planned to have Eaton find someone else to return the firearm is undermined by the magistrate judge's finding that Eaton "was genuinely shocked [when she saw the gun in the computer case], proclaiming that she had had no idea that the gun had been in there." (Sept. 3, 2008, Report & Recommendation at 3.) Furthermore, Defendant's proffered version of events would not entitle him to an innocent possession defense because he did not seek to immediately turn the gun over to law enforcement. Instead, he purportedly asked Eaton, herself a convicted felon, to find someone else to turn the gun over to law enforcement. Accordingly, the district court properly declined to give an innocent possession jury instruction.

### III.  U.S.S.G. § 5K2.11

Finally, Defendant argues that his below-guidelines sentence was unreasonable because his "possession of the firearm in this case is not related to the harm or evil the statute's drafters sought to prevent," and he was therefore entitled to a reduced sentence under Guidelines Section 5K2.11. (Opening Br. at 34.) Although Defendant's Section 5K2.11-departure argument "'has been rendered obsolete in post-*Booker* sentencing . . . the district court may apply [that] departure guideline[] by way of analogy in analyzing the section 3553(a) factors.'" *Schroeder*, 536 F.3d at 756 (quoting *Miranda*, 505 F.3d at 792).

Defendant does not challenge the district court's guidelines calculation or consideration of the 18 U.S.C. § 3553(a)

factors, only its refusal to depart from that guideline calculation under Section 5K2.11. That provision, which allows the sentencing judge to depart from the applicable advisory Guidelines range, provides:

> Sometimes, a defendant may commit a crime in order to avoid a perceived greater harm. In such instances, a reduced sentence may be appropriate, provided that the circumstances significantly diminish society's interest in punishing the conduct, for example, in the case of a mercy killing. Where the interest in punishment or deterrence is not reduced, a reduction in sentence is not warranted. For example, providing defense secrets to a hostile power should receive no lesser punishment simply because the defendant believed that the government's policies were misdirected.

> In other instances, conduct may not cause or threaten the harm or evil sought to be prevented by the law proscribing the offense at issue. For example, where a war veteran possessed a machine gun or grenade as a trophy, or a school teacher possessed controlled substances for display in a drug education program, a reduced sentence might be warranted.

In assessing the "harm or evil" that Congress sought to prevent in enacting Section 922, the Court should initially look to the language of the statute, which does not support Defendant's position:

> It shall be unlawful for any person . . . who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year . . . to . . .

possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce.

18 U.S.C. § 922(g)(1).

Additionally, the legislative history of 18 U.S.C. § 922 indicates that Congress sought to prohibit even a felon's brief possession of a firearm. *See Matthews*, 520 F.3d at 811. "The principle purpose of the federal gun control legislation . . . was to [curb] crime by keeping 'firearms out of the hands of those not legally entitled to possess them because of age, criminal background, or incompetency.'" *Huddleston v. United States*, 415 U.S. 814, 824, 94 S.Ct. 1262, 1268 (1974) (citing legislative history). Congress originally passed 18 U.S.C. § 922(g) "as the Federal Firearms Act of 1938 'to prevent the crook and gangster, racketeer and fugitive from justice from being able to purchase or in any way come in contact with firearms of any kind.'" *United States v. Lane*, 267 F.3d 715, 718 (7th Cir. 2001) (quoting *Barrett v. United States*, 423 U.S. 212, 220, 96 S.Ct. 498, 503 (1975), and omitting quotation from legislative history). This purpose has remained constant throughout Section 922's subsequent history. *Lane*, 267 F.3d at 718 (citing legislative history). After analyzing the legislative history, we recently found that in enacting Section 922, "Congress sought to divorce *completely* convicted felons from the use or possession of weapons and from the weapons trade*.*" *Matthews*, 520 F.3d at 810 (emphasis added). Accordingly, possessing a firearm even "for a brief period of time is sufficient to constitute

possession within the meaning of section 922*." Id.* at 811; *see also Lane*, 267 F.3d at 718 (finding that "holding a firearm establishes possession as a matter of law in the context of a charge under 18 U.S.C. § 922(g)(1)" and that "it is reasonable to infer that Congress intended to prohibit felons from exercising any physical control over a gun").

Ultimately, "[g]uns do not belong in the hands of felons." *United States v. Conley*, 291 F.3d 464, 473 (7th Cir. 2002); *see also United States v. Williams*, 425 F.3d 478, 482 (7th Cir. 2005) (in addressing the reasonableness of a sentence, noting that the Section 922(g) defendant's "unlawful possession of a loaded firearm—however brief or minimal it may have been—itself carried with it a concrete potential for further violence"). Section 922's plain language and legislative history demonstrate that Congress sought to prohibit Defendant's conduct here. Accordingly, the district court appropriately rejected Defendant's Section 5K2.11 argument and imposed a sentence that was reasonable.

## CONCLUSION

For the foregoing reasons, we affirm the district court.