No. 2—09—0747
Opinion filed April 11, 2011

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) | Appeal from the Circuit Court of Du Page County. |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 08—CF—2844 |
| | ) | |
| DAVID D. BURTON, | ) ) | Honorable Blanche Hill Fawell, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

PRESIDING JUSTICE JORGENSEN delivered the judgment of the court, with opinion.
Justices McLaren and Burke concurred in the judgment and opinion.

**OPINION**

On June 3, 2009, after a bench trial, defendant, David D. Burton, was found guilty of unlawful possession of a weapon by a felon (720 ILCS 5/24—1.1(a), (e) (West 2008)), unlawful possession of firearm ammunition by a felon (720 ILCS 5/24—1.1(a), (e) (West 2008)), possession of a firearm without a firearm-owner's identification (FOID) card (430 ILCS 65/2(a)(1), 14(c)(3) (West 2008)), and being an armed habitual criminal (720 ILCS 5/24—1.7(a)(3) (West 2008)). Prior to trial, on April 15, 2009, the trial court denied defendant's motion to quash his arrest and to suppress the weapon that formed the basis of the charges. On appeal, defendant argues that the court erred in denying his motion to suppress, because there was no valid consent for the warrantless search of his coat pocket. For the following reasons, we affirm.

# I. BACKGROUND

## A. Motion to Suppress

The evidence at the hearing on defendant's motion to suppress revealed that, on October 14, 2008, defendant resided at a Carol Stream apartment with his girlfriend of seven years, Candace Garland, and her two children, mother, and three siblings. Defendant resided at the apartment for approximately nine months (from February 2008 until his arrest on October 14, 2008). The apartment contains a front living space, a kitchen, two bedrooms, and a bathroom. At one time, defendant and Garland shared the back bedroom. Both agreed, however, that, as of October 14, 2008, Garland did not share the back bedroom with defendant, *i.e.*, defendant was the only person to use the bedroom. The bedroom contains a closet with two doors such that the closet may be accessed from the bedroom and the bathroom. In the closet is a stacked washing machine and dryer that the apartment's occupants use. Garland kept some clothing and other items in the closet next to the washing machine and closer to the bathroom, and defendant kept all of his clothes on the opposite closet wall, closer to the bedroom and separate from Garland's belongings. Garland's name is on the lease to the apartment; defendant's name is not.

On October 14, 2008, at 8:44 p.m., a radio dispatch alerted Carol Stream police officers John Bucholz and Peter Spizzirri to a possible domestic incident at the apartment. At 8:46 p.m., the officers arrived at the apartment. Garland answered the door and invited the officers inside. Defendant was in the back bedroom, but walked to the front area of the apartment after the officers entered. According to defendant, he was on his cell phone at the time, asking his mother to send over a truck so that he could take his belongings, including his furniture, and leave the apartment. Spizzirri confirmed that he heard defendant on his cell phone making arrangements to leave the residence.

The officers informed Garland that police had received a call from her brother and sister about a domestic disturbance. While there was, apparently, an earlier disagreement between defendant and Garland's sister, both Garland and defendant denied that it was a physical altercation. According to the officers, there were no apparent physical injuries to either party and the apartment contents were undisturbed (*i.e.*, no furniture knocked over or other evidence of a fight). Nevertheless, to make further inquiries, Bucholz walked with Garland toward the kitchen while Spizzirri and defendant remained in the front room. At 8:49 p.m. (three minutes after their arrival), while the officers were separately speaking with Garland and defendant, the dispatcher announced to the officers that there was sensitive information for them and, at 8:52 p.m., the dispatcher informed the officers that, according to Garland's brother and sister, defendant kept a gun and drugs in the apartment, specifically, in a closet/laundry room off of one of the bedrooms and in an attic access panel in the ceiling of that closet.

At that time, Bucholz walked Garland toward the bedroom and explained that there might be a gun and drugs in the closet. Garland appeared surprised and "a little upset" and pointed out the closet to Bucholz. According to Bucholz, Garland told him to "go ahead and search." Thereafter, Garland signed a consent-to-search form authorizing the officers to search the "apartment." After Garland signed the form, Bucholz left her in the bedroom and walked to the front room to give the form to Spizzirri, to give to defendant. Bucholz then returned to the bedroom; he was not present when Spizzirri asked defendant to sign the form. Garland testified that she could hear only parts of the conversation and heard defendant say that he was not going to sign the form, because Garland's signature was already on it.

According to Spizzirri, after receiving the radio transmission about a possible weapon and drugs, he, for safety reasons, patted down defendant and instructed him to sit at the kitchen table. Bucholz and Garland walked to the bedroom; Bucholz ultimately returned with a consent-to-search form that he and Garland had already signed. Bucholz gave Spizzirri the form, and Spizzirri told defendant about the dispatch information concerning drugs and weapons. Spizzirri asked defendant to sign the form, and "[defendant said] you can search. Go ahead and search. He said, I will not sign the form because I'm not on the lease. I don't see as to why I would have to sign that form if I'm not on the lease." Spizzirri summarized that, while defendant refused to sign the consent form, he did not refuse consent to search the apartment:

"Q. You also asked for consent to search the apartment?

A. Yes.

Q. And he refused?

A. No, he did not.

Q. He gave you consent?

A. He said, go ahead and search the apartment, but I will not sign the form because I'm not on the lease."

Defendant testified that, as of the time of the suppression hearing, he had been convicted of seven felonies in nine years and, therefore, he understands his rights. When Spizzirri asked defendant to sign the consent form, "I refused" and "told him no. I told him it wasn't my apartment, really, and he says like, Miss Garland signed the lease. I said, okay. So, why do you need me to sign this?" Defendant further explained that he did not sign the consent form because "I just didn't want to sign it." He testified that, in response to Spizzirri's verbal request for permission to search the apartment,

"I told him no." Defendant agreed that he told Spizzirri that he (defendant) "had no need" to sign the consent form, because Garland was on the lease and had already signed it.

After bringing the consent form to defendant, Bucholz returned to the bedroom and began searching the closet. According to Bucholz, Garland told him that both she and defendant kept personal items in the closet. He began his search with the attic access in the closet, where he found drug-related items, including spoons with white residue on them and a "Pyrex cup that had been used to cook drugs in." Spizziri left defendant in the front room and joined Bucholz in the search. Spizzirri located the gun in a large, men's coat that was hanging in the closest. The coat also contained defendant's birth certificate and an IRS document with defendant's name on it. Defendant was subsequently arrested.

After hearing closing arguments, the trial court denied defendant's motion to suppress. The court found that Garland clearly consented to a search of the entire apartment, but that the State did *not* meet its burden of establishing that defendant consented to the search. Nevertheless, the court concluded, Garland had the authority to consent to a search of both the bedroom and the closet because it was a common area to which she had access.

Defendant moved the court to reconsider. At oral argument on the motion to reconsider, the court disagreed with defendant that he "expressly refused consent." The court summarized that the testimony at the suppression hearing included Spizzirri's position that defendant told the officers that they could go ahead and search, but that he would not sign the consent form. While defendant had testified that he neither gave verbal consent to the search nor signed the written consent to search, the court found lacking an "express refusal of consent" to search or a "clear and unequivocal objection" to the search. The court further clarified that it did *not* find the testimony to reflect that,

when expressly asked for consent, defendant said "no." Instead, the court explained that, while it found that the State did not meet its burden on consent, it had not made specific findings on what defendant did or did not say. "He maybe didn't consent, but he didn't object. And I think this case [*Georgia v. Randolph*, 547 U.S. 103 (2006)] requires a clear and unequivocal objection."

## B. Trial

As relevant to this appeal, the trial testimony largely mirrored the evidence presented at the suppression hearing. Garland reiterated that, while both she and defendant stored items in the closet, their items were separate and in different parts of the closet. Defendant kept a few coats in the closet; he was the only person to wear the coats—he did not let anyone else borrow them.

Garland's brother, Corey Kirkendoll, age 13, testified that he was not allowed to touch defendant's things or borrow his clothes. Nevertheless, when asked whether he was ever told not to touch defendant's things, Corey responded "no." Corey clarified that he had access to the closet and did his own laundry, but that he did not touch defendant's belongings when he used the washer and dryer.

Bucholz testified that, when he told Garland that dispatch informed him that there might be guns and drugs in the apartment, "she was upset. She was—she had a surprised look on her face and just seemed genuinely upset that that stuff might be in her apartment." Before Bucholz asked her, Garland immediately told him to search and directed him to the closet with the washer and dryer. Bucholz further testified that the first area he searched in the closet was the attic access, where he found a Pyrex glass measuring cup and spoon with white residue on them, as well as a copper scrubbing material.[1] Next, Spizzirri came in and began searching the closet; Bucholz saw Spizzirri

---

[1]Prior to trial, the State nol-prossed the charges related to possession of drug paraphernalia

search a coat and find a loaded handgun. According to Bucholz, "it was obvious that it was a man's jacket." Bucholz testified that, before beginning the search, he received formal consent from Garland to search the apartment and Spizzirri received verbal consent from defendant.

Spizzirri confirmed that, when he entered the closet, Bucholz had just completed pulling down items from the overhead attic access area. Spizzirri then began going through "male clothing" hanging just past the door leading into the closet from the bedroom. He searched inside the pockets of a large men's coat and located a handgun. According to Spizzirri, approximately 10 to 15 minutes passed from the time the officers entered the apartment to locating the weapon.

In closing argument, presumably to dispute ownership of the weapon, defense counsel noted that, even if the coat was obviously a man's coat, that "doesn't necessarily mean a man wears it. Coats—especially winter coats can be worn by anybody." Counsel further argued that, although Corey testified that he did not touch defendant's things, "in this household I think it would have been impossible not to touch other people's things." He noted that, while defendant might have had some privacy in the bedroom and in the bathroom, the apartment was "a mess," there were only two closets, things were stored everywhere, and everyone used and accessed the closet. He represented, "[t]hat closet was by no means a place that [defendant] exercised exclusive possession and control over. Everyone had access to it." In addition, counsel argued that nothing about defendant's behavior in the apartment suggested that he was trying to hide anything from police. Counsel conceded, "when he ultimately was asked if they could search, he said yes. He didn't sign the form[,] but he said yes. That's the officer's testimony." Counsel later again conceded that defendant "said go ahead and search. He didn't sign for it, but he verbally gave consent."

---

and, after trial, the court found defendant not guilty of unlawful possession of a controlled substance.

The trial court convicted defendant of unlawful possession of a weapon by a felon, unlawful possession of firearm ammunition by a felon, possession of a firearm without a FOID card, and being an armed habitual criminal. The court found that the gun belonged to defendant, noting that the gun was found in a man's coat along with an IRS letter to defendant and that, according to Garland's testimony, the coat belonged to defendant and he was the only person who wore it. (The court also noted that it had observed Garland as being a small woman.) The court sentenced defendant to six years' imprisonment on each count, the terms to run concurrently (and later amended the sentence on one conviction to five years).

Defendant moved the court to reconsider, reasserting his argument that the evidence should have been suppressed due to an unlawful search. The court denied defendant's motion. Defendant appeals.

## II. ANALYSIS

The sole issue on appeal is whether the trial court properly denied defendant's motion to suppress. Defendant argues that reversal is warranted for two reasons: (1) Garland lacked authority to consent to a search of defendant's coat pocket; and (2) regardless of Garland's authority, defendant expressly refused consent to the search. When reviewing a trial court's ruling on a motion to suppress, we defer to the trial court's findings of fact, reversing them only if they are against the manifest weight of the evidence, but review *de novo* the court's ultimate determination of whether suppression is warranted. *People v. McDonough*, 239 Ill. 2d 260, 265-66 (2010). On appeal, we remain free to consider not only the record at the suppression hearing, but also the trial evidence (see *People v. Caballero*, 102 Ill. 2d 23, 34-36 (1984); *People v. Robinson*, 391 Ill. App. 3d 822, 830 (2009)), and to draw our own conclusions from the evidence. *McDonough*, 239 Ill. 2d at 266.

## A. Garland's Authority to Consent to Search

Defendant argues first that Garland lacked the authority to consent to a warrantless search of his coat pocket. Preliminarily, however, we must address the State's argument that defendant forfeited this argument by not raising it below.[2] Specifically, the State argues that, in his motion to suppress, defendant argued only generally that there was no consent to search the closet and bedroom. Defendant did not argue that his coat pocket was a closed container beyond the scope of third-party consent. Moreover, the State adds, defendant at trial did not argue that Garland could not consent to a search of his coat because it was a closed container. Rather, defendant's theory at trial was only that the contraband was not his. Indeed, as to consent, the State notes, defense counsel at trial conceded in his closing argument that defendant verbally consented to the search. Thus, the State argues, we should not consider defendant's closed-container argument.

We do not agree that this issue is forfeited. While it is true that, in the motion to suppress, defendant generally argued lack of valid consent as it pertained to the closet, as opposed to, specifically, his coat pocket, defendant's consistent argument below was that his rights were violated when police executed a warrantless search without valid consent thereto: this was his argument at the suppression stage; he objected at trial to testimony regarding the search on the basis that his motion to suppress was improperly denied; and, finally, he argued in his posttrial motion that the motion to suppress had been improperly denied. Accordingly, although defendant's argument that

_____

[2]Actually, the State asserts that defendant "waived" the argument, but the State confuses waiver, a voluntary relinquishment of a known right, with forfeiture, the failure to raise an issue that could have been raised and, therefore, is barred. See *People v. Tomczak*, 395 Ill. App. 3d 877, 879 (2009).

Garland lacked authority to consent to the search of his coat pocket is more specific than those arguments raised below, it still touches on the lack of valid consent for a warrantless search and we decline to find it forfeited.

The United States and Illinois Constitutions protect individuals from unreasonable searches and, generally, searches without a warrant are presumptively unreasonable. U.S. Const., amend. IV; Ill. Const. 1970, art. I, §6; *Illinois v. Rodriguez*, 497 U.S. 177, 181 (1990). An exception to the warrant requirement exists where law enforcement officers obtain consent to the search from either the person whose property is being searched or from a third party who possesses "common authority" over the premises. *United States v. Matlock*, 415 U.S. 164, 171 (1974). Consent is determined by whether a reasonable person would have understood—by an individual's words, acts, or conduct—that consent had been granted. See, *e.g.*, *Florida v. Jimeno*, 500 U.S. 248, 251 (1991). Common authority rests "on mutual use of the property by persons generally having joint access or control for most purposes" such that each assumes the risk that the other may permit the common area to be searched. *Matlock*, 415 U.S. at 171 n.7; see also *People v. Stacey*, 58 Ill. 2d 83, 89 (1974) (adopting in Illinois *Matlock*'s common-authority test in third-party-consent cases). Therefore, the authority justifying third-party consent is based not on the law of property but, rather, on the idea that mutual use of the property by persons having joint access or control for most purposes makes it reasonable to recognize that each may, in his or her own right, permit the inspection. *People v. Bull*, 185 Ill. 2d 179, 197 (1998). The State bears the burden of establishing common authority. *Rodriguez*, 497 U.S. at 181.

Common authority may be either actual or apparent. In other words, under the "apparent authority" doctrine, a warrantless search does not violate the fourth amendment where the police

receive consent from a third party whom the police *reasonably believe* possesses common authority, but who, in fact, does not. *Id.* at 187-88. The reasonableness standard is objective: would the facts available to the officer cause a reasonable person to believe that the consenting party had authority over the premises? If so, the search is valid. *Id.* at 188-89. If not, however, an officer may not blindly accept a person's consent to search, and a warrantless search without further inquiry is unlawful. *Id.* Again, the State bears the burden of proving that the officers were objectively reasonable in their belief that the consenting person had the authority to consent. *People v. James*, 163 Ill. 2d 302, 317 (1994).

Here, defendant does not dispute that Garland possessed actual authority to consent to a search of the closet. Indeed, defendant conceded at the scene that it was not his apartment and that the officers did not need his signature on the consent form because Garland, the leaseholder, had already signed it. Further, it is undisputed that Garland (and all of the apartment's occupants) had access to the closet and that Garland kept personal belongings therein. Defendant does dispute, however, that Garland had actual or apparent authority to justify the warrantless search of his "closed container," *i.e.*, his coat pocket. With respect to actual authority, he asserts that the evidence is undisputed that the coat was his and that he was the only person to wear it. Further, with respect to apparent authority, he argues that the police could not have reasonably believed that Garland had authority to permit the search of his coat because, within the closet, his clothing was separate from Garland's and the officers quickly discerned that it was "obviously a man's jacket." Defendant argues that the scope of Garland's consent could not include "the inside contents of closed objects hidden from view." At that point, defendant argues, the officers were required to make further inquiry into whether Garland could consent to a search of his coat pocket, because the apparent-authority

doctrine does not permit officers to assume consent in ambiguous circumstances. Therefore, defendant argues, the trial court erred in failing to suppress the gun and, absent that evidence, his convictions cannot stand and must be reversed. We disagree and conclude that Garland had apparent common authority to consent to the search.[3]

Defendant's argument is premised on the notion that a homeowner's consent to search a home does not extend to another person's private, closed container or object to which the homeowner has no access. See *Bull*, 185 Ill. 2d at 197-98; see also *United States v. Karo*, 468 U.S. 705, 725 (1984) (O'Connor, J., concurring, joined by Rehnquist, J.). Defendant likens his coat pocket to a closed object and asserts that it was an enclosed space within a common area. "[C]ontainers used to hold one's most personal belongings command a higher degree of privacy," and such closed containers or objects might include lockers, suitcases, zipped duffel bags, and purses. *People v. Miller*, 346 Ill. App. 3d 972, 983-84 (2004); see also *People v. James*, 163 Ill. 2d 302, 318 (1994). In some cases, pockets have been considered closed spaces for purposes of determining whether third-party consent to search was lawful. See, *e.g.*, *United States v. Adams*, 583 F.3d 457, 465 (6th Cir. 2009) (finding valid third-party consent to search jacket pocket); *United States v. Robinson*, 999 F. Supp. 155, 163 (D. Mass. 1998) (finding invalid third-party consent to search pants pocket). The inquiry into

---

[3]We note that defendant's entire argument regarding Garland's authority to consent to the search of his coat is irrelevant if *he* consented to the search. At trial, defense counsel conceded that defendant verbally consented to the search. However, the concession, which was not evidence, matters not to our analysis. We ultimately conclude that the trial court's denial of the motion to suppress must be affirmed because Garland's consent rendered the search valid and because defendant did not expressly refuse consent to the search.

whether the party consenting to a search of closed items has apparent or actual authority to do so is necessarily fact specific. See *United States v. Ross*, 456 U.S. 798, 822-23 (1982) (fourth amendment protection varies depending on facts of each case); see also *Miller*, 346 Ill. App. 3d at 984. Moreover, in assessing apparent authority, "[w]e cannot use hindsight; the circumstances at the time of the entry control the determination whether the police reasonably believed that they had obtained valid consent." *People v. Huffar*, 313 Ill. App. 3d 593, 597 (2000).

Here, before searching the closet, the officers knew that: Garland was a leaseholder of the apartment and defendant was not; defendant and Garland were in a dating relationship and had, for most of the duration of defendant's stay in the apartment, shared the back bedroom that accessed the closet; Garland and defendant continued to share the closet with both keeping clothes and personal items therein; the closet was not locked or private but, rather, contained two doors, including one that accessed the apartment's only bathroom; the closet held the apartment's washing machine and dryer; and all *eight* people residing in the apartment had access to the closet to, at a minimum, do laundry. We conclude, based on this information, that, even if Garland lacked actual authority to permit the search of defendant's coat (an issue we do not reach), the officers reasonably *believed* that Garland possessed authority to permit a search of the closet, including defendant's coat.

Further, we note that defendant's actions reinforced the reasonableness of the officers' belief that Garland held authority to permit the search. Specifically, defendant remarked that, because he was not named on the lease and Garland had signed the form, the officers did not need him to sign the form. In addition to this comment, defendant made no effort to object to or stop the search as it progressed. Accordingly, the officers' belief that Garland held authority to consent to the search, and, according to their testimony, that defendant had acquiesced to the search, was reasonable where

defendant's silence during the search was coupled with his *explanation* for his decision not to sign the form, *i.e.*, because he did not think he had *standing* to sign the form, not, specifically, because he objected to the search. See, *e.g.*, *Adams*, 583 F.3d at 464 (the defendant by his conduct abandoned any privacy interest he had in coat when he was present during the search but did not indicate by his actions that he had a privacy interest or otherwise claim an ownership interest therein); see also 4 Wayne R. LaFave, Search and Seizure §8.3(g), at 179 (4th ed. 2004) (claim of third-party common authority can be reasonably relied upon by police where other person is present and could be expected to object if the claim of authority were in error, but is silent).

Defendant makes much of the facts that, within the closet, he and Garland did not intermingle their clothes and that it was obvious to the officers that the coat belonged to a man. We disagree with defendant that the fact that the coat was "obviously" a man's inherently created a sufficiently ambiguous situation rendering the officers unreasonable in not making further inquiries regarding the scope of Garland's consent. Regardless of the gender for which the coat was designed: (1) coats *can* be worn by anybody; and (2) there is nothing in the record to indicate that, in this closet where she kept her belongings, Garland *could not* access or touch defendant's things. Moreover, we note again that defendant's assertion that he effectively had no standing to consent to the search fostered Garland's apparent authority to search "the apartment." Defendant did not express that Garland's apparent authority was qualified or limited and, thus, the officers were reasonable to believe that Garland's consent extended to even a man's coat.

In this vein, we disagree that this case is like *James*, 163 Ill. 2d at 318, where the driver's authority to consent to a search of the automobile did not extend to a purse found on the passenger seat. The court in *James* noted that a purse is not normally shared by two or more persons. *Id.* Nor

is this case like *Miller*, where the third-party consent did not extend to a zipped duffel bag found in a locked locker that police pried open. *Miller*, 346 Ill. App. 3d at 983-84. Here, contrary to defendant's assertion, there was no evidence presented that his coat was "hidden from view." Defendant did not take any action with respect to the coat that might indicate that he held a particular expectation of privacy to it as opposed to any other object in the closet. For example, the coat was not enclosed in a zipped hanging bag, or placed inside a closed suitcase, or removed from the closet and stored somewhere in the bedroom where, at that point in time, only he resided. See *United States v. Jackson*, 598 F.3d 340, 347 (7th Cir. 2010) (in applying fact-specific inquiry to decide whether someone has apparent authority, it is more reasonable for an officer to believe that a third party has full access to an open crate than, for example, a defendant's purse or briefcase). For these reasons, it was not unreasonable for the officers to be unconcerned that the coat might be subject to heightened privacy concerns. Accordingly, we do not think the officers unreasonably believed that Garland's consent to search the closet for a gun and drugs included defendant's coat therein where, clearly, the coat could contain the object of the search, *i.e.*, a weapon or drugs. See *Jimeno*, 500 U.S. at 251 ("The scope of a search is generally defined by its expressed object.").

Similarly, we do not find convincing in these circumstances defendant's argument that Garland could not consent because the coat belonged to him and he alone wore it. One factor to be considered in assessing common authority is whether the parties had *joint access* to the item searched. See *Bull*, 185 Ill. 2d at 197. The mere fact that the apartment occupants did not, in fact, wear defendant's coat does not reflect that the consenting party—Garland, defendant's girlfriend of seven years who shared the closet with him—"was *denied* the mutual use, *access to*, or control over it." (Emphases added.) *Id.* at 198 (where the defendant lived with his girlfriend in her house and they

shared a bedroom, court upheld the girlfriend's consent to a search of a closed box in the bedroom, even though she did not know what was inside it and told the police that it belonged to the defendant, because the fact that the defendant alone used the box did not mean that the girlfriend had been denied mutual access to it); see also *Stacey*, 58 Ill. 2d at 89-90 (wife's consent to search of dresser where husband kept clothes was upheld because "[t]he mere fact that the [husband] alone may have used this dresser drawer while his wife may have used another or another dresser does not indicate that the wife was denied the mutual use, access to or control of the drawer"); *People v. Ford*, 83 Ill. App. 3d 57, 63 (1980) (wife could consent to search of tool box in basement even though it belonged to her husband and only he used the tools; basement was not locked and wife was not instructed not to handle the tools, so the mere fact that only he used them did not indicate that the wife was denied mutual use, access to, or control over them). Here, the mere facts that the coat belonged to defendant and that only he wore it do not mean that Garland was denied mutual access to it in the closet that they shared. Accordingly, we conclude that the police were reasonable in their belief that Garland could consent under the apparent-authority doctrine to a search of defendant's coat in the closet.

### B. Defendant's "Express Refusal" to Consent

Defendant argues next that, even if we conclude that Garland had actual or apparent authority to search, his express refusal to allow the search invalidated Garland's authority and rendered the search unlawful. Relying on *Georgia v. Randolph*, 547 U.S. 103 (2006), defendant argues that a third party's consent to search property over which he or she shares common authority does not trump the express refusal of consent from the person whose belongings are being searched. Defendant argues that the trial court here erred in reasoning that an individual refusing consent must

clearly and unequivocally object to the search. Rather, defendant contends, he refused consent and he did not need to do anything further. Accordingly, defendant argues, the subsequent search of his belongings was invalid. We disagree.

In *Randolph*, the Supreme Court addressed the question whether a warrantless search based on one co-occupant's consent is valid if the other co-occupant, who later seeks to suppress the evidence, was present at the scene and "expressly refuse[d] to consent." *Id.* at 106. There, the defendant's estranged wife consented to a search of the marital residence after the defendant had "unequivocally refused" to give consent to search the house. *Id.* at 107. The court held that "a warrantless search of a shared dwelling for evidence over the *express refusal of consent* by a physically present resident cannot be justified as reasonable as to him on the basis of consent given to the police by another resident." (Emphasis added.) *Id.* at 120.

Here, we agree with the trial court that defendant did not expressly refuse to consent to the search. According to his own testimony, defendant's express refusal to *sign the form* was based on his belief that, because he was not named on the lease, it was unnecessary. Defendant did not testify that he told the officers that he would not sign the form because he did not want them to search, nor did he testify that, in fact, he did not sign the form because he objected to the search. Rather, defendant explained to the officers that he did not need to sign because he was not named on the lease, and then he proceeded to sit in the front room while the search took place. He never indicated that he wanted the search to cease, and he did not take any other action that could reasonably be interpreted as an express refusal of consent. We note that, although defendant testified that when asked for verbal consent to the search he said "no," the trial court here did not credit that testimony. Specifically, the trial court stated that it did *not* find the testimony to reflect that, when expressly

asked for consent, defendant said "no." Instead, the court explained that, while it found that the State did not meet its burden on consent, it had not made specific findings on what defendant did or did not say. The court instead found that the evidence lacked the express refusal of consent. The trial court is in the best position to judge witness credibility, and we cannot conclude that its finding that defendant did not expressly refuse consent is against the manifest weight of the evidence. *McDonough*, 239 Ill. 2d at 266 (trial court is in a superior position to determine and weigh the credibility of the witnesses, observe the witnesses' demeanor, and resolve conflicts in their testimony).

Defendant points to *People v. Sweborg*, 293 Ill. App. 3d 298, 302 (1997), where a defendant, in response to an officer's request to search the trunk of his car, replied " 'No. I really don't want you to.' " While the officer searched the trunk, the defendant repeated, " 'I thought I told you I didn't want you to look through my personal items,' " and he put his hand over a guitar case that was in the trunk and that the officer was trying to open. *Id.* at 303. The appellate court disagreed with the trial court's assessment that the defendant consented to the search when he showed the officer how to remove the key from the ignition but then withdrew the consent when the officer searched the trunk. Instead, the court found that consent was never given, holding that "[a] 'No' means literally that. There are no requirements for a defendant to couch his denial of consent in anything but a simple statement saying 'No.' " *Id.* at 304. Here, however, defendant did not simply say "no" or "no, I really don't want you to" search. Nor did he try to interrupt the search at any point. Instead, defendant said that he would not sign the form, because the officers did not need his consent. Defendant's refusal to sign the *form* was not a clear refusal to consent to the *search*.

Further, citing *United States v. Plugh*, 576 F.3d 135 (2nd Cir. 2009), defendant analogizes this case to a defendant's refusal to sign a *Miranda* form, which, he asserts, must, absent a prior or

contemporaneous statement showing a willingness to speak, be interpreted as an election *not* to waive *Miranda* rights. *Id.* at 141. Nevertheless, defendant quickly asserts that he is by no means suggesting that the refusal to sign a consent-to-search form is *per se* an express refusal of consent, irrespective of the surrounding circumstances. To the contrary, we read defendant's argument to be exactly that. Defendant acknowledges that he and the officers at the suppression hearing diverged on whether he verbally consented, but, even if we accept the trial court's finding that defendant did not verbally consent, we are left only with defendant's refusal to sign the form—again, the court specified that it had *not* found that, when expressly asked for consent, defendant said "no." That finding is not contrary to the manifest weight of the evidence. Defendant does not wish us to consider the *reasons* he expressed for not signing the form, which had nothing to do with expressing an objection to the search. As such, by asking us to find that he expressly refused consent by simply not signing the form, defendant indeed asks us to find that a refusal to sign a consent-to-search form is, irrespective of the surrounding circumstances, a *per se* express refusal of consent. We decline to do so.

Accordingly, we agree with the trial court that, in these circumstances, defendant's refusal to sign the form does not equate to the express refusal of consent to the search contemplated by *Randolph* and that defendant's reliance on that case is misplaced.

### III. CONCLUSION

For the foregoing reasons, the judgment of the circuit court of Du Page County is affirmed.

Affirmed.