2024 IL App (1st) 221598-U

No. 1-22-1598

Order filed November 20, 2024

Third Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 14 CR 4374 |
| | ) | |
| | ) | Honorable |
| TRAMIAN BARNES, | ) | Thomas V. Gainer Jr. |
| | ) | and Joanne F. Rosado |
| Defendant-Appellant. | ) | Judges, presiding. |

_____

JUSTICE D.B. WALKER delivered the judgment of the court.
Presiding Justice Lampkin and Justice Martin concurred in the judgment.

**ORDER**

¶ 1    *Held*:  We affirm defendant's convictions for first degree murder and armed robbery over his contentions that the trial court erred when it denied his first amended motion to suppress evidence and that he was not proven guilty beyond a reasonable doubt of armed robbery. Pursuant to the one-act, one-crime rule, defendant's mittimus is corrected to reflect one conviction for first degree murder.

¶ 2 Following a jury trial, defendant Tramian Barnes was found guilty of first degree murder and armed robbery, and sentenced to natural life in prison.[1] On appeal, he contends that the trial court erred when it denied his first amended motion to suppress evidence, and that he was not proven guilty beyond a reasonable doubt of armed robbery. For the following reasons, we affirm in part, vacate in part, and correct defendant's mittimus.

¶ 3                                 I. BACKGROUND

¶ 4 Defendant was charged by indictment with multiple counts of first degree murder and armed robbery following the January 20, 2014 death of Alex Anderson. The counts for first degree murder, in relevant part, alleged that defendant, without lawful justification, shot and killed Anderson while armed with a firearm intentionally or knowingly (count I), knowing that such an act created a strong probability of death or great bodily harm (count II), and during the commission of an armed robbery (count III). The counts for armed robbery alleged that defendant took marijuana from Anderson by force or by threatening the imminent use of force and defendant carried on or about his person or was otherwise armed with a firearm (count XVI), personally discharged a firearm during the offense (count XVII), and personally discharged a firearm during the offense that proximately caused Anderson's death (count XVIII).

¶ 5 On March 2, 2016, defendant filed, through private counsel, a first amended motion to suppress evidence, alleging that his bedroom was searched without his consent.[2] The motion further alleged that the signatory of the consent to search form, Quentin LeFlore, leased the

---

[1] The Honorable Thomas V. Gainer Jr. presided over the hearing on the motion to suppress evidence and the Honorable Joanne F. Rosado presided over trial.

[2] On May 27, 2015, appointed counsel filed a motion to suppress evidence. However, on March 2, 2016, private counsel moved to withdraw that motion, which the trial court allowed. Private counsel then filed the first amended motion to suppress.

bedroom to defendant, and therefore did not have actual or apparent authority to consent to a search. The motion noted that law enforcement obtained a search warrant for the bedroom after the initial search. The motion asserted, however, that because the warrant was secured after an illegal search, the warrant application was not based on an independent source, and was consequently invalid. The motion concluded that suppression of items recovered was therefore warranted.

¶ 6                          A. Motion to Suppress Evidence

¶ 7     At the hearing on the motion, LeFlore testified that on January 21, 2014, he lived in the 400 block of South May Street in Joliet, Illinois. When asked if he was defendant's landlord at that time, LeFlore responded, "Yeah, you could say that." Defendant paid LeFlore "[l]ike $300" for a room. There was no signed lease agreement. LeFlore did not store possessions in defendant's room or freely enter and exit that room. To LeFlore's knowledge, defendant locked the room when he left the residence.

¶ 8     That day, LeFlore was in his room when his son told him that police had surrounded the house. As he walked to the front room, officers knocked and entered through the front door at the same time. The officers put everybody on a couch. When asked, LeFlore told officers that he did not know defendant's whereabouts and that defendant rented a room. LeFlore pointed out defendant's room. At that time, the door to the room was closed. LeFlore did not know whether it was locked.

¶ 9     An officer entered the room, exited after 60 to 90 seconds, and closed the door. The officer then had LeFlore sign papers in which he stated that "nothing in that room was mines [*sic*]" and "waiting for a search warrant." He signed two pieces of paper, and thought one was a consent to

search form. LeFlore denied giving permission to search defendant's room prior to the officer entering the room. At that point, LeFlore did not know whether he had the right to give officers permission to search defendant's room.

¶ 10    During cross-examination, LeFlore testified that he did not know if he had the right to tell them no. He agreed with the State that he did not have a "problem" because he had not done anything wrong. At the time of the search, LeFlore had lived in the three-bedroom single family home for four to five months and had a written lease. He did not have a written lease with defendant. None of the rooms had "key locks," but the doors could be locked from the inside.

¶ 11    The officers asked LeFlore where defendant's room was located, and he pointed down the hall. He did not believe that the officer used a key to enter the room and there was no damage to the door. LeFlore was later given a consent to search form, which he reviewed, signed, and "[k]ind of" understood. LeFlore acknowledged that he should have read the form. He believed that he signed a form which stated that anything found in the room was not his. LeFlore then admitted that he gave officers permission to search the room. He identified the consent to search form that he signed around 4 p.m. on January 21, 2014. He acknowledged that the form also stated "1315 hours" and "verbal," but asserted that he did not know what "verbal" meant. He remained at the house until officers permitted people to leave around 7 to 8 p.m.

¶ 12    During examination by the court, LeFlore testified that he thought the police were "raiding" the house because he had not seen or heard from defendant for several days. When the officers entered, they told LeFlore that they were looking for defendant. LeFlore verified that the bedroom doors only locked from the inside.

¶ 13    The State presented the testimony of United States Marshal Jason Norwick, who testified that on the morning of January 21, 2014, he was asked to "put surveillance" on the South May residence based upon an investigative alert with probable cause to arrest and given descriptions of defendant and a woman named Ashley Frey. Around 1 to 1:15 p.m., he observed two individuals matching those descriptions enter the residence. Norwick then contacted Jamie Toczek, a member of his team, and the Joliet Police Department.

¶ 14    When officers arrived, Norwick sent some to the back of the house. He approached the front door and observed that it was ajar. The door swung open as he knocked and announced himself. There were five to six adults and Norwick realized that the people he saw enter were not defendant and Frey. One man asked what he could do for Norwick, who stated that he was looking for defendant. The man pointed down the hallway and said, "back there." A second man, whom Norwick later learned was LeFlore, came from the hallway and asked, "what's going on, what can I do?" When Norwick said they were there for defendant, LeFlore pointed down the hallway and said, "room is back there."

¶ 15    Norwick said he would like to have a look, if that was okay. LeFlore shrugged and responded, "okay." Norwick entered the bedroom through the open door and checked to see if anyone was present. As he approached the closet, he saw a "reflection" from an object in an open backpack. He observed a bulletproof vest behind the closet door and then double-checked the backpack because he believed he had seen the reflection from a firearm. He notified other officers that there was at least one firearm in the bedroom and that the room needed to be secured. Norwick then checked the rest of the house for defendant.

¶ 16    During cross-examination, Norwick acknowledged that in a later conversation with LeFlore, LeFlore stated that defendant rented a room from LeFlore. When Norwick entered the room, all he knew was that the bedroom belonged to defendant. He was unaware of the "financial arrangements." When Norwick asked if defendant was there, LeFlore did not confirm or deny defendant's presence; rather, LeFlore indicated that "his room" was "back there."

¶ 17    In his report, Norwick stated that he performed a protective sweep of the residence. Based upon the information Norwick gathered in the room, Chicago police then obtained a search warrant for the bedroom. Norwick reviewed the complaint for a search warrant and agreed that it stated that defendant was a leaseholder at the property.

¶ 18    During redirect, Norwick agreed that the complaint for a search warrant stated that defendant rented a room from leaseholder LeFlore.

¶ 19    Chicago police detective Leonard Goduto testified that he was assigned to investigate a shooting that occurred on the evening of January 20, 2014, and that Chicago police sergeant James Prah told him that Anderson stated twice that "Trey's the one that shot me."[3] Goduto also spoke to David Pappish, who stated that Anderson related that he was shot in the stomach and arm by "Trey."[4] Officers also observed a text message on Anderson's phone which stated, "Trey shot me."

¶ 20    During a conversation on the morning of January 21, 2014, with Victoria Faso, Anderson's girlfriend, she identified Trey as defendant and showed Goduto a photograph of defendant and his vehicle. After speaking to defendant's family, Goduto learned of a potential address on South May in Joliet. At 9:51 a.m., an investigative alert with probable cause for murder for defendant bearing

---

[3] Detective Goduto's last name is also spelled Godouto in the record. For clarity, we use Goduto, the spelling he used at trial.

[4] For clarity, we will refer to members of the Pappish family by their first names.

the South May address was issued. Goduto also contacted the Fugitive Apprehension Unit, which included Toczek and members of the United States Marshal Service.

¶ 21    During cross-examination, Goduto acknowledged that he did not seek an arrest warrant on January 21, 2014. An arrest warrant was later issued for defendant.

¶ 22    In closing argument, the defense asserted that defendant rented a room from LeFlore, albeit without a written lease. Counsel noted that LeFlore recalled that the door to defendant's room was closed and that Norwick testified that it was open. Counsel argued that Norwick had no reason to search defendant's room based upon Norwick's testimony that he was performing a protective sweep of the house looking for defendant. Moreover, even accepting that Norwick performed a protective sweep, returning to a bag and looking inside was beyond the scope of that sweep. Counsel further noted that Norwick did not testify as to any exigent circumstances. Counsel concluded that Norwick entered and searched the house without consent.

¶ 23    The court then asked whether counsel agreed that LeFlore testified that there was no lock on the outside of the door. Counsel agreed, but noted that LeFlore testified that the door was closed. Counsel further argued that whether the door was open was not dispositive, because once an officer crossed the "threshold" into an area where he was not authorized to be, he committed an illegal entry that led to an illegal search.

¶ 24    The State responded that LeFlore testified on direct that defendant always locked the door, which was untrue based on LeFlore's later testimony. The State also argued that it was incredible for LeFlore to claim that he signed a form other than the consent to search form. The State further argued that Norwick believed defendant entered the house, which provided probable cause, and that the front door was ajar. Then, as Norwick entered the residence, he asked where defendant

was and was directed to the back. Norwick believed he had consent based upon the person in the living room and LeFlore directing him. The State concluded that, because LeFlore was the leaseholder, he had authority to consent to a search.

¶ 25 The State opined, however, that saying LeFlore was in a landlord relationship with defendant was "overstepping." The State further argued that even if the court found more of a legal landlord relationship, Norwick acted based upon the actions of a person whom he believed had the authority to consent. After searching the room for defendant, Norwick closed the door, spoke to individuals, and memorialized the consent to search.

¶ 26 In rebuttal, defense counsel asked why a search warrant was obtained if Norwick believed he had consent. The court then asked counsel about the exigency of finding a murder suspect. Counsel noted that Norwick saw someone he believed was defendant, and went over to "settle the question." However, Norwick was never affirmatively told whether defendant was present. The only reason Norwick believed defendant was present was because defendant lived there.

¶ 27 In denying the motion, the court noted that there was probable cause to arrest defendant and that Norwick's initial entry into the home was justified. Norwick was searching for a murder suspect and "appropriate" exigent circumstances warranted entry into the room and the search for defendant. The court further found Norwick to be credible, as he did not recover the firearm but secured the room to ensure that the firearm was recovered pursuant to a "process issued by a judge," *i.e.*, a warrant.

¶ 28 The matter proceeded to a jury trial.

¶ 29                                   B. Trial

¶ 30    Faso testified that in January 2014, she was Anderson's girlfriend. On January 18, 2014, defendant, whom she knew as "Trae," called her to ask that Anderson call him because defendant wanted to buy "weed." She knew that Anderson sold marijuana, but did not know if Anderson and defendant had "done business before." Thereafter, when she was with Anderson, she did not mention the conversation with defendant. Later, when she was at home, she saw a missed text from Anderson which stated, "Trae shot me twice, I love you so much." Faso spoke with detectives and showed them the text. She told detectives who Trae was, shared his phone number, and showed detectives a photo from his Instagram account.

¶ 31    Tracie Pappish testified that in January 2014, Anderson lived with her family. Sometime after 10 p.m. on January 21, 2014, Anderson "pounded" on Tracie's bedroom door, stating that he had been shot. Her husband, David, asked what happened and Anderson replied that "Trae shot me." David called 911. When police arrived, Anderson again stated that "Trae" shot him. Anderson was taken to a hospital where he later passed away.

¶ 32    James Prah, who had retired from the Chicago Police Department, testified that on January 20, 2014, he responded to a shooting and observed a man, whom he later learned was Anderson. Anderson "did not look good." Prah asked if he had been shot, and Anderson related that he was shot in the stomach and the arm while in a vehicle. Prah asked who shot him, and Anderson replied, "Trey shot me" and "I don't want to die." Although Anderson did not know Trey's last name or address, he used his phone to show Trey's phone number to Prah and stated that Trey was a "male black" who drove a dark-colored vehicle. Prah issued a flash message with that information.

¶ 33    The State presented a stipulation establishing, relevant here, that during Anderson's autopsy, his fingerprints were taken and two bullets were recovered from his body.

¶ 34    A second stipulation established that a black wallet containing a debit card bearing defendant's name, a .32-caliber firearm, a .22-caliber firearm, a wood box containing small empty plastic bags and a larger bag containing suspected cannabis, and a clear plastic bag that contained two smaller plastic bags containing suspected cannabis were recovered from a bedroom at the South May residence. The stipulation further established that the wood box and the plastic bags were inventoried under inventory number 13091805, the suspected cannabis was inventoried under inventory number 13091062, and the clear plastic bag that contained two smaller plastic bags containing suspected cannabis was inventoried under inventory number 13091064.

¶ 35    The State presented additional testimony establishing that one of the bullets recovered during Anderson's autopsy was fired from the .22-caliber firearm.

¶ 36    Illinois state police forensic scientist Joseph Wohrstein testified that his analysis of inventory number 13091062, a sandwich size resealable plastic bag which contained an additional plastic bag, revealed defendant's fingerprint on the outer bag.[5] Wohrstein's analysis of inventory number 13091064, one large plastic bag and two plastic bags which contained additional plastic bags, revealed Anderson's fingerprint on one of the "inner" bags.

¶ 37    Norwick testified consistently with his testimony at the suppression hearing. He additionally testified that he smelled marijuana when he approached the front door of the South May address. Upon entering the house, Norwick asked LeFlore, who was later described as the owner or renter of the house, the whereabouts of defendant. LeFlore pointed "down the back hall"

---

[5] The State's earlier stipulation provided that the wood box and the plastic bags were inventoried under inventory number 13091805, and the suspected cannabis was inventoried under inventory number 13091062. Based on Wohrstein's testimony that he only received the bags and not the suspected cannabis, it appears that the inventory numbers were transposed in the stipulation.

and said, "back there." The door was open, so Norwick did a visual inspection from the hallway before entering and searching for defendant. He caught the reflection of what turned out to be a silver firearm. After clearing the room, he "locked it down."

¶ 38  Goduto also testified consistently with his testimony at the suppression hearing. He further testified that Anderson's phone contained messages between Anderson and a contact listed as "Trae." At trial, Goduto identified photographs of text messages recovered from Anderson's phone between Anderson and "Trae."

¶ 39  These text messages were admitted into evidence and are contained in the record on appeal. The January 20, 2014, text messages between Anderson and "Trae" state, relevant here, "Let me get them zones for a good price," and "I gotta run em 300 flat gee." Another exchange states, "Koo swing me like 3 850" and "Sup bro need them today[,] got you the 3 for 850?" The messages then set a meeting at a "laundry matt [*sic*]," and end with "30 minutes on the *** way now."

¶ 40  After defendant was arrested in Georgia, Goduto transported defendant to Chicago. Goduto acknowledged that, during the investigation, defendant's cousin Wesley, who lived in Georgia, was identified as an "unapprehended co-offender."

¶ 41  The defense moved for a directed verdict arguing, in pertinent part, that no evidence established an armed robbery and that Anderson did not allege that defendant took anything from him. The State responded that this was a "weed deal" in which defendant wanted a discount and that one of the bags recovered from the room containing defendant's debit card, *i.e.*, defendant's room, had Anderson's fingerprint on it. The trial court denied the motion.

¶ 42  Following closing argument, the jury retired to deliberate. The jury sent several notes to the trial court. One asked, "was the money recovered *** from the drug deal?" and the court

answered that the jury had all the evidence and to "please continue to deliberate." Another note asked, "do we have to give a[n] unanimous decision on both charges?" and the court answered, "yes, please refer to your instructions." The jury ultimately found defendant guilty of first degree murder and armed robbery.

¶ 43    Defendant filed a motion for judgment of acquittal notwithstanding the verdict or in the alternative, for a new trial, alleging relevant here, that the trial court erred when it denied defendant's pretrial motions and that defendant was not proven guilty beyond a reasonable doubt. The trial court denied the motion.

¶ 44    Following argument, the trial court merged the armed robbery counts, and sentenced defendant to natural life in prison on count XVI for armed robbery and three counts of first degree murder. Defendant made an oral motion to reconsider sentence, which the court denied.

¶ 45                                    II. ANALYSIS

¶ 46    On appeal, defendant first contends that the trial court erred in denying the first amended motion to suppress evidence when the police lacked exigent circumstances, did not have consent to enter the residence or search the bedroom, and relied on an "ever-evolving" series of after-the-fact rationales to justify the search.

¶ 47    Initially, the State asserts that defendant has forfeited this argument on appeal for failure to raise it with specificity in a posttrial motion. Defendant responds that his posttrial motion specifically alleged that the trial court erred by denying his pretrial motions. Alternatively, he requests that this court review this issue pursuant to the plain error doctrine.

¶ 48    The plain error doctrine permits a reviewing court to consider forfeited errors when a clear or obvious error occurred and either (1) "the evidence is so closely balanced that the error alone

threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error," or (2) "the error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *People v. Moon*, 2022 IL 125959, ¶ 20. The first step in a plain error analysis is determining whether there was error, because without reversible error, there can be no plain error. See *People v. Cosby*, 231 Ill. 2d 262, 273 (2008). Here, regardless of the specificity of defendant's posttrial motion, the trial court did not err in denying the motion.

¶ 49 A defendant filing a motion to suppress evidence bears the burden of making a "*prima facie* case that the evidence was obtained by an illegal search or seizure." *People v. Brooks*, 2017 IL 121413, ¶ 22. Where the basis for the motion is an allegedly illegal search, a defendant must establish that there was a search and that it was illegal. *Id*. Once the defendant makes a *prima facie* case, the burden shifts to the State to present evidence to counter it. *Id*.

¶ 50 When reviewing the trial court's ruling on a motion to suppress evidence, we apply a two-part standard of review. *People v. Grant*, 2013 IL 112734, ¶ 12. We accord great deference to the trial court's factual findings and will reverse those findings only if they are against the manifest weight of the evidence. *Id*. That said, "a reviewing court remains free to undertake its own assessment of the facts in relation to the issues and may draw its own conclusions when deciding what relief should be granted" *People v. Hackett*, 2012 IL 111781, ¶ 18.

¶ 51 We review *de novo* the trial court's ultimate legal ruling as to whether suppression was warranted (*id*.), and may consider evidence from the suppression hearing and the trial (*People v. Hood*, 2019 IL App (1st) 162194, ¶¶ 38-39). We may affirm the trial court's ruling on a

suppression motion "on any basis appearing in the record, whether or not the trial court relied on that basis or its reasoning was correct." *People v. Daniel*, 2013 IL App (1st) 111876, ¶ 37.

¶ 52　Pursuant to the exclusionary rule, courts cannot admit evidence that police obtained in violation of the fourth amendment. *People v. Sutherland*, 223 Ill. 2d 187, 227 (2006). The Supreme Court has held, as "a basic principle of Fourth Amendment law[,] that searches and seizures inside a home without a warrant are presumptively unreasonable." (Internal quotation marks omitted.) *Welsh v. Wisconsin*, 466 U.S. 740, 748-49 (1984); see also *People v. Bull*, 185 Ill. 2d 179, 196-97 (1998) ("The fourth amendment prohibits the warrantless search of a person's home as *per se* unreasonable."). Thus, defendant established a *prima facie* case of an unreasonable search, *i.e.*, Norwick's warrantless entry into the residence.

¶ 53　With the *prima facie* case established, the burden shifted to the State to demonstrate the constitutionality of the search. *Brooks*, 2017 IL 121413, ¶ 22. The State can carry that burden by proving the existence of "a few specifically established and well-delineated exceptions to the warrant requirement." *Bull*, 185 Ill. 2d at 197. A warrantless search is *per se* unreasonable unless it is conducted pursuant to consent, incident to an arrest, or is based on probable cause and exigent circumstances that make it impractical to obtain a warrant. *People v. Alexander*, 272 Ill. App. 3d 698, 704 (1995).

¶ 54　One exception is when exigent circumstances demand the officer's warrantless entry. *People v. McNeal*, 175 Ill. 2d 335, 345 (1997); see also *People v. Foskey*, 136 Ill. 2d 66, 74 (1990) ("The fourth amendment does not prohibit officers from entering a home without a warrant if exigent or compelling circumstances justify the entry."). Factors for determining whether exigent circumstances exist include whether: (1) the offense was recently committed; (2) there was any

"deliberate or unjustified delay" by officers when a warrant could have been obtained; (3) a grave offense was involved; (4) the officers reasonably believed that the suspect was armed; (5) the officers acted on a clear showing of probable cause; (6) there was a likelihood that the suspect would escape if not swiftly apprehended; (7) the officers had a strong reason to believe the suspect was inside; and (8) the entry was made "peaceably, albeit nonconsensually." *People v. Williams*, 161 Ill. 2d 1, 26 (1994); see also *People v. Nicols*, 2012 IL App (2d) 100028, ¶ 59. The guiding principle in determining whether exigent circumstances exist is reasonableness and each case must be decided based on the totality of the circumstances known to the officers when they acted. *People v. Cobb*, 97 Ill. 2d 465, 484 (1983). The State has the burden to demonstrate that exigent circumstances justified a warrantless search or arrest. *Foskey*, 136 Ill. 2d at 76.

¶ 55    Here, defendant concedes that the State had sufficient probable cause to apply for, and likely obtain, a warrant for his arrest, that these were serious offenses, and that there was a possibility that he was armed. He maintains, however, that other factors weighed against the trial court's finding that appropriate exigent circumstances existed. Defendant asserts that the offenses were not recently committed and that officers were not actively pursuing him. He further argues that there was no likelihood of escape when Norwick had surveilled the house and officers later surrounded it. Defendant finally argues that officers had time to obtain a warrant. He notes that by 9:51 a.m. on January 21, 2014, Goduto had issued an investigative alert for defendant which listed the South May Street address, and could have obtained an arrest warrant and a search warrant.

¶ 56    "That probable cause existed, *** is not alone sufficient to justify a warrantless entry into a suspect's home to effect an arrest." *Id*. at 77.  Here, although the offense was committed on the evening of January 20, 2014, by 9:51 the following morning, an investigative alert was issued

based upon Anderson's oral and written identification of defendant as the shooter, and Faso's identification of defendant and his vehicle. Goduto detailed the events leading to the issuance of the investigative alert, and acknowledged that he did not seek an arrest warrant on January 21, 2014. While a practical difficulty facing police officers is the time required to obtain a warrant, there was no testimony at the hearing that obtaining an arrest warrant for defendant or a search warrant for his address would have been difficult. See *People v. Bui*, 381 Ill. App. 3d 397, 408 (2008). The circumstances here do not show that any delay in obtaining arrest and search warrants would have hampered the investigation or apprehension of defendant. See *People v. Davis*, 398 Ill. App. 3d 940, 949-50 (2010) (that officers acted quickly in locating the defendant and had probable cause to arrest him did not excuse the warrant requirement when there was no immediate and clear danger to the police or others and no circumstances indicated that the delay relating to obtaining a warrant would have impeded the arrest or apprehension of the defendant).

¶ 57    Although Norwick believed that he observed defendant enter the residence, he admitted that upon seeing the person in close proximity, he realized that it was not defendant. At that point, the house was surrounded by officers, so the likelihood of defendant escaping, if he were present, was unlikely. Considering the totality of the circumstances at the time Norwick entered the residence, we conclude that, although there was probable cause to arrest defendant, there were insufficient exigent circumstances to justify Norwick's warrantless entry into the house. See *Williams*, 161 Ill. 2d at 26.

¶ 58    That said, once Norwick entered the South May residence, he received consent to search defendant's bedroom.

¶ 59    A voluntary consent search is valid as long as consent is given, if not by the person "whose property is searched," then by a third party who possesses common authority over the premises. See *Illinois v. Rodriguez*, 497 U.S. 177, 181 (1990). Common authority does not depend on property law but instead rests on mutual use of the property by persons generally having joint access or control for most purposes. *United States v. Matlock*, 415 U.S. 164, 170-71 (1974); see also *People v. Stacey*, 58 Ill. 2d 83, 88-89 (1974) (recognizing the common authority test in third-party consent cases in Illinois).

¶ 60    The authority justifying third party consent is based on the concept that mutual use of a property makes it reasonable to recognize that each person may, in his or her own right, permit the inspection of that property. *People v. Burton*, 409 Ill. App. 3d 321, 328 (2011). Common authority exists in family, marital, and cohabitant relationships. *People v. Bell*, 403 Ill. App. 3d 398, 406 (2010). When a person who has common authority over the premises consents to a search, his or her consent is valid against an absent, nonconsenting person who shares that authority. *Matlock*, 415 U.S. at 169-70. A warrantless search does not violate the fourth amendment where the police receive consent from a person whom they reasonably believe possesses authority to consent, but who, in fact, does not. *Rodriguez*, 497 U.S. at 185-86. If the facts available to the officer cause a reasonable person to believe that the consenting person had authority over the premises, the search is valid. *Id*. at 189. If the facts do not, an officer may not simply accept a third party's consent, and a warrantless search without further inquiry is unlawful. *Id.* at 188-89 It is the State's burden to establish that an officer was reasonable in believing that the consenting party had the authority to consent. *Burton*, 409 Ill. App. 3d at 329.

¶ 61    Here, as Norwick entered the residence, he observed five to six adults, one of whom asked what he could do for Norwick. Norwick stated that he was looking for defendant. The man pointed down the hallway and said, "back there." Then, LeFlore entered from a hallway and asked, "what's going on, what can I do?" When Norwick reiterated that officers were there for defendant, LeFlore pointed down the hallway, and said, "room is back there." At this point, Norwick stated that he would like to have a look, if that was okay, and LeFlore shrugged and responded, "okay." While Norwick's and LeFlore's testimony differed as to whether the door to defendant's bedroom was opened or closed, LeFlore's testimony established that the doors did not lock from the outside. Moreover, while it was unclear whether defendant was somewhere in the home, he was not present to object to the search. Accordingly, when there were no objections to the search, and LeFlore responded to Norwick's request to look at defendant's room with a shrug and an "okay," Norwick was not unreasonable to believe that LeFlore had the authority to consent to the search. *Id.*

¶ 62    In fourth amendment jurisprudence, reasonableness is measured by examining the totality of the circumstances. See *People v. McDonough*, 239 Ill. 2d 260, 272 (2010). Under these circumstances, the warrantless search of defendant's bedroom was reasonable based upon LeFlore's consent to the search. We therefore affirm the trial court's denial of the first amended motion to suppress. See *Daniel*, 2013 IL App (1st) 111876, ¶ 37.

¶ 63    Defendant next contends that he was not proven guilty of armed robbery beyond a reasonable doubt when the State failed to establish that he took marijuana from Anderson by force or threat of force. He notes that although Anderson stated that Trae shot him, Anderson did not state that Trae took anything.

¶ 64    In reviewing the sufficiency of the evidence, "the question is 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) *People v. McLaurin*, 2020 IL 124563, ¶ 22 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). This standard applies whether the evidence is direct or circumstantial. *People v. Jackson*, 232 Ill. 2d 246, 281 (2009). The trier of fact is responsible for resolving conflicts in the testimony, weighing the evidence, and drawing reasonable inferences from the facts presented at trial. *McLaurin*, 2020 IL 124563, ¶ 22. "In reviewing the evidence, this court will not retry the defendant, nor will we substitute our judgment for that of the trier of fact." *Id.* We reverse a conviction only when the evidence is so unreasonable, improbable, or unsatisfactory that it creates a reasonable doubt of a defendant's guilt. *People v. Newton*, 2018 IL 122958, ¶ 24.

¶ 65    To sustain a conviction for armed robbery as charged in count XVI of the indictment, the State had to establish beyond a reasonable doubt that defendant took marijuana from Anderson by force or by threatening the imminent use of force and defendant carried on or about his person or was otherwise armed with a firearm. See 720 ILCS 5/18-2(a)(2) (West 2014).

¶ 66    "It is well established that the elements of armed robbery may be proved by circumstantial evidence." *People v. Harris*, 2012 IL App (1st) 100678, ¶ 84; see also *People v. Johnson*, 2018 IL App (1st) 150209, ¶ 19 (a criminal conviction may be based solely on circumstantial evidence). However, that circumstantial evidence must be of "a conclusive nature and produce a reasonable and moral certainty that the offense charged was actually committed." *Harris*, 2012 IL App (1st) 100678, ¶ 84. Circumstantial evidence is proof of facts or circumstances that give rise to reasonable inferences of other facts that tend to establish guilt or innocence of the defendant. *Johnson*, 2018

IL App (1st) 150209, ¶ 19. Circumstantial evidence is sufficient to support a criminal conviction, provided that such evidence satisfies proof beyond a reasonable doubt of the elements of the crime charged. *Id.* The jury need not be satisfied beyond a reasonable doubt as to each link in the chain of circumstances. *Id.*

¶ 67     Here, the circumstantial evidence, taken in the light most favorable to the State, was sufficient for a rational trier of fact to have concluded that defendant took marijuana from Anderson by threat or by threatening the imminent use of force and was armed with a firearm.

¶ 68     Faso's testimony at trial established that defendant contacted her on January 18, 2014, because he wanted to buy "weed" from Anderson, and the text messages between defendant and Anderson established that they planned to meet for a marijuana transaction. Additionally, defendant's debit card, two firearms, a wood box containing small empty plastic bags and a larger bag containing suspected cannabis, and a clear plastic bag that contained two smaller plastic bags containing suspected cannabis were recovered from a bedroom at the South May residence. Subsequent analysis of these plastic bags revealed defendant's and Anderson's fingerprints. Moreover, Anderson related to several people that Trae, *i.e.*, defendant, shot him.

¶ 69     Given that defendant and Anderson planned to meet for a marijuana transaction, Anderson later identified defendant as the person who shot him, and bags, one of which bore defendant's fingerprint and one of which bore Anderson's, were later recovered from the same room as defendant's debit card and the firearm which fired one of the bullets retrieved from Anderson's body, the trier of fact could reasonably infer that defendant shot Anderson and took the marijuana that Anderson planned to sell to him. *People v. Gray*, 2017 IL 120958, ¶ 35.

¶ 70    Defendant contends, however, that no trial testimony described the "exact events" surrounding the shooting and the State failed to present "clear or persuasive" evidence that the marijuana recovered from defendant's room was linked to the shooting.

¶ 71    Contrary to defendant's assertion, the lack of eyewitness testimony was not fatal to the State's case. As discussed, a criminal conviction may be based solely on circumstantial evidence. See *Johnson*, 2018 IL App (1st) 150209, ¶ 19; see also *People v. Zirko*, 2012 IL App (1st) 092158, ¶ 55 ("it is well settled in Illinois that a conviction can be sustained solely on circumstantial evidence").

¶ 72    Defendant further argues that no proceeds from the robbery were recovered, asserting that "no evidence whatsoever" linked the marijuana recovered from his room to the shooting of Anderson. He further posits that Anderson may have simply touched a bag of marijuana that belonged to defendant "prior to the shooting." However, there is no requirement that robbery proceeds be recovered in order to sustain a conviction. See, *e.g.*, *People v. Hughes*, 259 Ill. App. 3d 172, 177-78 (1994) (affirming an armed robbery conviction though no firearm or proceeds were found on the defendant's person 20 minutes after the crime occurred). Moreover, when weighing evidence, the trier of fact is not required to disregard inferences flowing naturally from the evidence before it or search out all possible explanations consistent with innocence and raise them to the level of reasonable doubt. See *In re Jonathon C.B.*, 2011 IL 107750, ¶ 60.

¶ 73    Accordingly, viewing the evidence in the light most favorable to the State, we cannot say that no rational trier of fact could have concluded that the evidence established that defendant and Anderson planned to meet for a marijuana transaction, and that during that meeting defendant shot Anderson and took the marijuana. A defendant's conviction is reversed only when the evidence is

so unreasonable, improbable, or unsatisfactory that reasonable doubt of his guilt remains (*Newton*, 2018 IL 122958, ¶ 24); this is not one of those cases. Defendant's conviction for armed robbery is therefore affirmed.

¶ 74 Finally, the State alleges that defendant's mittimus should be corrected, pursuant to the one-act, one-crime rule, to reflect one conviction for first degree murder when there was one victim. The State acknowledges that defendant does not raise this issue, but argues that this claim is reviewable pursuant to the second prong of the plain error doctrine. See *People v. Coats*, 2018 IL 121926, ¶ 10 ("one-act, one-crime violations fall within the second prong of the plain error doctrine as an obvious error so serious that it challenges the integrity of the judicial process").[6]

¶ 75 Here, defendant's mittimus bears three convictions for first degree murder, intentional murder (count I), knowing murder (count II), and felony murder (count III). See 720 ILCS 5/9-1(a)(1), (a)(2), (a)(3) (West 2014).

¶ 76 As discussed, the plain error doctrine permits review of forfeited errors when a clear or obvious error occurred and either (1) "the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error," or (2) "the error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *Moon*, 2022 IL 125959, ¶ 20. One-act, one-crime violations fall within the second prong of the plain error doctrine. *Coats*, 2018 IL 121926, ¶ 10. Whether the one-act, one-crime rule has been violated is a question of law we review *de novo. Id.* ¶ 12.

_____

[6] See *People v. Carlisle*, 2015 IL App (1st) 131144, ¶ 86 (a corrected mittimus "may be issued at any time"); *People v. Rios*, 2022 IL App (1st) 171509, ¶ 101-02 (*sua sponte* raising and correcting a one-act, one-crime issue).

¶ 77 Pursuant to the one-act, one crime rule, a defendant may not be convicted for multiple offenses based on the same physical act. *Id.* ¶ 11. "Where but one person has been murdered, there can be but one conviction of murder." *People v. Kuntu*, 196 Ill. 2d 105, 130 (2001). When multiple murder convictions have been entered on the same act, we must uphold only the conviction for the most culpable charge and the convictions for the less culpable charges must be vacated. *Id.* Our supreme court has established that intentional murder is a more serious offense than knowing murder and felony murder. *People v. Pitsonbarger*, 142 Ill. 2d 353, 377-78 (1990).

¶ 78 As defendant's three convictions for first degree murder were all premised on the death of a single person, Anderson, we agree with the State that two cannot stand. Thus, we vacate defendant's convictions for knowing murder (count II) and felony murder (count III), and affirm his conviction for intentional murder (count I). We need not remand the cause to correct this error because all three convictions were for the same offense, the first degree murder of Anderson, and the mittimus reflects that the trial court imposed identical sentences. See *People v. Price*, 221 Ill. 2d 182, 194-95 (2006) (finding remand was unnecessary where one-act, one-crime principles required the vacatur of multiple theft convictions because both the statutory penalty and the concurrent sentences imposed were identical). We therefore vacate defendant's convictions and sentences on counts II and III for first degree murder. We affirm defendant's conviction and sentence on count I for first degree murder, and correct the mittimus pursuant to our authority under Illinois Supreme Court Rule 615(b)(1) (eff. Jan. 1, 1967). See *People v. McCray*, 273 Ill. App. 3d 396, 403 (1995) (remand was unnecessary because "this court has the authority to directly order the clerk of the circuit court to make the necessary corrections"); see also *Carlisle*, 2015 IL App (1st) 131144, ¶ 86.

¶ 79                                III. CONCLUSION

¶ 80    For the foregoing reasons, we vacate defendant's convictions for first degree murder under counts II and III and correct the mittimus. We affirm the judgment of the circuit court of Cook County in all other respects.

¶ 81    Affirmed in part and vacated in part; mittimus corrected.